# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL DEAN SCOTT,         )   Case No. 4:07-CV-0753
                              )
       Petitioner,           )
                              )   JUDGE JOHN R. ADAMS
       vs.                  )
                              )   <u>MEMORANDUM OF OPINION</u>
MARK HOUK, Warden,          )   <u>AND ORDER</u>
                              )   [RESOLVING DOC. 12]
       Respondent.         )

Petitioner, Michael Dean Scott ("Scott" or "Petitioner"), has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (Doc. 12). He challenges his convictions by a Stark County Jury and sentence of death. In addition to reviewing Scott's Petition, the Court has reviewed the Respondent, Mark Houk's ("Respondent"), Return of Writ (Doc. 15), the Petitioner's Traverse, (Doc. 47), and the Respondent's Sur-Reply, (Doc. 48).

For the following reasons, Scott's Petition for Writ of Habeas Corpus is DENIED.

Furthermore, as will be explained below, Scott's motion to amend the petition is also DENIED.

### I. Factual Background

On September 24, 1999, Scott was indicted by a Stark County Grand Jury, charging him with the following seven counts: (1) aggravated murder of Dallas Green; (2) aggravated murder of Ryan Stoffer with prior calculation and design; (3) aggravated murder of Ryan Stoffer while committing kidnapping and/or aggravated robbery; (4) aggravated robbery of Ryan Stoffer; (5) kidnapping of Ryan Stoffer; and (6)-(7) carrying a firearm while under disability. The two counts of aggravated murder each contained the following three death penalty specifications: (1) the aggravated murder

occurred while committing or attempting to commit an aggravated robbery; (2) the aggravated

murder occurred while committing or attempting to commit kidnapping; (3) the aggravated murder

was part of a course of conduct involving the purposeful killing of two or more persons.  Ohio Rev.

Code 2929.04(A)(5) & (A)(7).

Scott pled guilty to two counts of possession of a firearm while under a disability prior to

trial.  A jury trial on the remaining counts began with jury selection on March 21, 2000.  *Return*,

Trial Tr., Vol. 2, at 1.  The presentation of evidence began on March 27, 2000.  *Return*, Trial Tr. Vol.

6, at 14.  The facts as stated by the Ohio Supreme Court are as follows:

> The circumstances that gave rise to these convictions began during the early morning
> hours of August 24, 1999, as Scott, then 22 years of age, and his friends Michael
> Wilson and Ryan Allen walked from the Canton Centre Mall toward the apartment
> of Amber Harsh, one of Scott's girlfriends. Dallas Green, who did not know Scott or
> his friends, drove past them, and Scott shouted "Hey," prompting Green to stop his
> vehicle. Green exited his vehicle and waited for the three to join him.
>
> The four men began talking. Green told them "about the party he was going to at his
> girl friend's, stuff like that." As their conversation continued, Green started talking
> as if the others "were his girlfriends." He pointed at Scott, Allen, and Wilson, telling
> each, "[Y]ou are my bitch."
>
> After talking for about a half hour, Green returned to his vehicle and got inside. Scott
> approached Green and asked for a ride. Green responded that "he couldn't do it."
> Scott then asked Green for the time. When Green turned his head to look at the clock
> on the dashboard, Scott pointed a .22 caliber handgun at him, said, "[N]ow who the
> bitch mother fucker," and then shot Green twice in the back and once in the left
> cheek.
>
> Green drove off, but after traveling a few blocks, collided with a parked vehicle near
> the Old-Timer's Club on Tenth and Ross Streets. He later died at Mercy Medical
> Center from the gunshot wounds inflicted by Scott.
>
> After shooting Green, Scott fled the scene with Wilson and Allen and went to Harsh's
> apartment. There, Scott emptied the shell casings from the handgun and threatened
> Wilson and Allen that he would shoot them if they told anybody about the shooting.

2

Allen and Wilson later explained that they had failed to report the crime because they feared for their safety.

Thereafter, Scott asked his friend Todd Jewell if he had ever heard of Dallas Green, and Jewell said that he had not. Jewell asked Scott if Green had been killed and Scott said, "Yeah." On a later occasion, as Jewell and Scott drove near the Old-Timer's Club, Scott pointed and stated, "[T]his is where I killed Dallas at."

In early September, Scott mentioned to Jewell that he wanted to test drive a vehicle and kill the owner. Despite Jewell's protest that Scott did not have to kill anyone in order to steal a car, Scott reiterated his idea during a later conversation with Jewell and another friend, Dustin Hennings. Hennings also told Scott that he could steal the car without killing anyone.

After these conversations, on Friday, September 10, 1999, Scott, one of his girlfriends, Kerry Vadasz, and Jewell saw a Ford Probe with a "for sale" sign in the window parked in the front yard of Ryan Stoffer's grandmother on Dryden Avenue in Canton, Ohio. Scott wrote down the telephone number and told Jewell that he wanted to call the owner, take the car for a test drive, have Vadasz drive, and shoot the owner from the back seat. Scott then called the number and arranged to test drive the vehicle the next day. As Jewell drove Scott to test drive the vehicle, Scott again mentioned that he wanted to follow through with his plan to kill the owner and steal the car. Scott asked Jewell to drive the Probe, but he declined, stating that he did not know how to operate a standard transmission vehicle.

Nevertheless, Scott and Jewell met Stoffer, who took them for a test drive that afternoon. Scott then told Stoffer that he wanted his girlfriend to look at the car and that he would call him on Sunday to make arrangements.

The following Sunday afternoon, Vadasz called Stoffer from the home of Scott's brother Anthony Scott and arranged to meet Stoffer at Stoffer's grandmother's house in Canton, Ohio. Jewell then drove Scott and Vadasz to Canton but did not accompany them on the test drive. Brenda Stoffer, Ryan Stoffer's mother, watched her son, Scott, and Vadasz get into the car, thinking that they would return after a short test drive.

Vadasz drove the Probe, Stoffer sat in the front passenger seat, and Scott rode in the back seat. She drove the car for the next hour and a half. As time passed, Stoffer provided directions on how to return to his grandmother's house, but ostensibly because Vadasz had little experience with driving a standard transmission, Scott told her to keep driving until she got used to it.

Scott eventually removed a .22 caliber handgun from his pants pocket and placed it

3

on the seat. According to his confession to the police, "[a]fter about ten minutes, [he] just lifted [the gun] up and sat it back behind the head rest of [Stoffer's] chair. And just left it sittin' there for like two more minutes." Scott then fired six shots into the back of Stoffer's head.

Afterward, Scott and Vadasz dumped Stoffer's body in a secluded, wooded area and then drove to a friend's home to clean up. They placed plastic trash bags on the front passenger seat so that Vadasz would not get blood on her, and then Scott drove to her home in Akron, where they parked Stoffer's car in her garage. Later that evening, Scott telephoned Jewell and reported killing Stoffer and dumping his body in the woods. According to Jewell, Scott said that "he shot him once, and afterwards he kind of freaked out and he put the other five bullets in the gun into his head." Scott then asked Jewell to "help him bury the body," but Jewell refused.

Later that evening, Scott and Vadasz returned to Canton in Stoffer's Probe. While there, Scott talked about the shooting with Jewell and Hennings. Hennings remembered Scott saying that "he just put the gun behind the boy's head and pulled the trigger once, and he said then he emptied the whole clip in the same hole in the back of his head through the padding of the seat." Scott also mentioned that he had left the gun at Vadasz's home in Akron. Scott and Vadasz eventually returned to Akron, and on Monday morning, Scott drove the Probe to work.

When Stoffer did not return from the test drive Sunday evening, his mother called the police. Her husband had informed her that the people who took the test drive had called and said that "they don't want the car; they don't have the money." The Stoffer family heard nothing further about Stoffer until the following Wednesday when the sheriff's department informed them that his body had been found.

On Monday, the day after Stoffer's murder, Jewell telephoned Scott and advised him that he had seen a news report about Stoffer's disappearance on television. In response, Scott stated, "I am going to get rid of this thing, I'll call you back." Scott and Vadasz then cut the bloody seatbelt out of the Probe and threw it into a sewer across the street from Vadasz's apartment. They also put on latex gloves and tried to "wipe everything off" the Probe.

Scott then drove the Probe toward Hartville and "ditched the car" near a vacant building. Before leaving, he squirted lighter fluid on the front seat, back seat, and dashboard but could not set the car ablaze, as neither he nor Vadasz had matches. The two then walked back to Akron.

On Tuesday, September 14, the police obtained Stoffer's telephone records showing that on the day of the test drive, a telephone call had been made to the Stoffer home from Anthony Scott's residence. When the police contacted him, Anthony reported

4

that Scott and Vadasz had used his phone on that date. Anthony later told Scott what he had told the police, and Scott replied that "he was thinking about killing [Anthony] and [his] girlfriend and [his] kids."

On the same day, the police received an anonymous telephone call linking Scott to Green's murder. Until they received that call, Scott had not been a suspect in that murder.

The next day, a representative from the Stark County Sheriff's Office and the Canton Police Department arrested Scott. Vadasz cooperated with law enforcement by leading them to Stoffer's body and his car and by consenting to a search of her home. During that search, police recovered a .22-caliber Smith & Wesson revolver, a box of .22-caliber ammunition, and bloodstained clothing belonging to Scott. They also recovered the seatbelt from the Probe that had been thrown into the sewer.

Police Lieutenant Michael Firth interviewed Scott about Stoffer's murder. Scott provided a detailed confession consistent with the facts outlined herein. Detectives then asked him about Green's murder. He initially denied any involvement but then blurted out, "[O]kay, I did it," and provided a detailed account of Green's murder.

*State v. Scott*, 101 Ohio St.3d 31, 32-35 (2004).

Jury selection began on March 21, 2000. *Return*, Trial Tr., Vol. 2, at 1. At the conclusion of the proceedings, the jury convicted Scott on all counts and specifications. *Id.* at Apx. Vol. 7, 147-61. The penalty phase of trial began on April 4, 2000. Scott presented testimony regarding his neglectful mother, placement into a foster home, and subsequent adoption. Dr. Robert Smith also testified about Scott's psychological ailments. Further facts will be set forth as necessary to resolve the claims raised in the Petition.

## II. Procedural History

### A. Direct Appeal

Scott filed a timely notice of appeal to the Ohio Supreme Court on May 26, 2000. *Return*, Apx. Vol. 8, at 4-6. In a brief filed November 16, 2000, Scott raised the following ten propositions

of law:

1. The capital specifications convictions for the charge of aggravated murder are against the manifest weight of the evidence. The evidence was insufficient as a matter of law to support appellant's capital convictions and should be reversed.

2. It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in conducting their R.C. 2929.04(A) review of "similar cases" for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a life sentence with parole eligibility after twenty full years or life with a parole eligibility after thirty full years was imposed. The current method also violates the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of appellant's protected rights as well, all as set forth in the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16 and 20, Article I of the Ohio Constitution.

3. It is prejudicial error for a trial court to sentence Defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of Defendant's rights as guaranteed to him by the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10, and 16 of Article One of the Ohio Constitution.

4. The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code 2929.05, in violation of Defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10 and 16 of Article One of the Ohio Constitution.

5. R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16 of Article I of the Ohio Constitution.

6. The due process clause is violated by a jury charge which permits a criminal

6

conviction on proof less than beyond a reasonable doubt.

7.      R.C. 2929.04(B)(7) is unconstitutionally vague and may be understood by jurors as reasons for imposing the death sentence.

8.      R.C. 2941.25 is violated when the court imposes sentences consecutive to a death penalty sentence.

9.      The Appellant's right to effective assistance of counsel is prejudiced by counsel's defective performance.

10.     Spectator's misconduct that prejudices Appellant and creates undue victim sympathy with the jury is cause for reversal.

*Return*, Apx. Vol. 8, at 47-9.  The State filed its merit brief on February 5, 2001.  *Return*, Apx. Vol. 8, at 217.  The Ohio Supreme Court affirmed Scott's convictions and sentences in an opinion issued January 14, 2004.  *State v. Scott*, 101 Ohio St.3d 31 (2004).[1]  Scott filed a Petition for a Writ of Certiorari with the Unites States Supreme Court, but that Court denied the Petition on June 14, 2004.  *Scott v. Ohio*, 542 U.S. 907 (2004).

### B. Post-Conviction Proceedings

Scott also filed a petition for post-conviction relief with the Stark County Court of Common Pleas.  He filed an amended petition on February 5, 2001, raising the following seven grounds for relief:[2]

1.      Petitioner Scott's convictions and sentences are void and/or voidable because pretrial publicity denied Scott his right to a fair and impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 5 and 10 of the

---

[1]     Justice Pfeifer wrote a separate, dissenting opinion indicating that he would have reversed the course-of-conduct death specification because the murders involved dissimilar circumstances.  *Id.* at 50-1.

[2]     Although Scott's petition lists eight grounds for relief, the actual petition is misnumbered and contains only seven grounds, listed herein.

Ohio Constitution. *Irvin v. Dowd*, 366 U.S. 717 (1961).

2.  Petitioner Scott's convictions and sentences are void and/or voidable because he was denied the effective assistance of counsel when his trial attorneys failed to file a motion for a change of venue, thus depriving Scott of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

3.  Petitioner Scott's convictions and sentences are void and/or voidable because victim impact evidence in the form of family and media demands for the death sentence contaminated the jury, thus denying Scott the right to have the sentencing decision made by the jury and judge as guaranteed by the Eighth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.

4.  Petitioner Scott's convictions and/or sentences are void and/or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

5.  Petitioner's death sentence is void or voidable because the trial court excluded relevant testimony from his mitigation hearing, thereby violating Petitioner's rights under the Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

6.  The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. Amends. VIII, IX, XIV; Ohio Const. Art. I §§ 9, 10, 16; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases).

7.  Petitioner Scott's judgment and sentence are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in his Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights as secured by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth

8

            Amendments to the United States Constitution, and Article I, Sections 2, 9,
10, and 16 of the Ohio Constitution.

*Return*, Apx. Vol. 9, at 29-47.  The post-conviction court denied relief on December 21, 2004.  *State*

*v. Scott*, No. 1999-CR-1154, slip op. (Ohio Ct. Common Pleas Dec. 21, 2004); *Return*, Apx. Vol.

9, at 467-9.

        Scott filed a notice of appeal to the Fifth District Court of Appeals on January 19, 2005.  In

a brief filed thereafter, he raised the following six assignments of error:

1. The trial court erred by adopting verbatim the prosecution's response to the post-conviction petition and failing to make its own findings of fact and conclusions of law.

2. The trial court erred in denying Scott's motion to strike the prosecutor's response when that response was filed over two years past the statutory and court-set deadlines.

3. The trial court erred in granting the State summary judgment when there were genuinely disputed issues of material fact and summary judgment was inappropriate as a matter of law.

4. The trial court erred when it denied Scott's post-conviction petition without first affording him the opportunity to conduct discovery.

5. The trial court erred by applying the doctrine of *res judicata* to bar Scott's grounds for relief one, five, and six.

6. The trial court erred in dismissing Scott's post-conviction petition when he presented sufficient operative facts to merit relief or, at minimum, an evidentiary hearing.

*Return*, Apx. Vol. 10, at 19.  The Fifth District Court of Appeals affirmed the trial court's decision

on January 23, 2006.  *Return*, Apx. Vol. 10, at 420-50.  Scott filed a memorandum in support of

jurisdiction with the Ohio Supreme Court, but that court declined to accept jurisdiction on June 21,

2006.  *Return*, Apx. Vol. 11, at 100.

### C. *Murnahan* Appeal[3]

Scott filed a timely application to reopen with the Ohio Supreme Court on April 13, 2004.

He alleged that his appellate counsel had been ineffective in nine instances, as alleged below:

1.  A capital defendant has a remedy under the Eighth and Fourteenth Amendments when a court fails to apply the required narrowing constriction to a "course-of-conduct" aggravating circumstance specification in a capital case.  U.S. Const. Amends. V, VI, XIV; Ohio Const. Art. I §§ 1, 2, 5, 10, 16.

2.  It is prejudicial error for a trial court to deny a motion to sever pursuant to Ohio R. Crim. P. 14 when the defendant has met the burden of proof, thus prejudicing Appellant in violation of his constitutional protections.  U.S. Const. Amends. V, VIII, XIV; Ohio Const. Art. I §§ 1, 2, 5, 10, 16.

3.  Trial counsel rendered prejudicially ineffective assistance when they conceded guilt in the opening statement of Appellant's capital trial without the consent of the Appellant thereby violating his constitutional rights.  U.S. Const. Amends. V, VI, VIX; Ohio Const. Art. 1 §§ 1, 5, 10, 16, 20.

4.  Trial counsel rendered prejudicially ineffective assistance when they failed to move for mistrial after the victim's family wore inappropriate clothing and made outbursts in the courtroom in the presence of the jury.  U.S. Const. Amends. V, VI, XIV; Ohio Const. Art. 1 §§ 1, 10, 16.

5.  It was prejudicial error for the trial court to exclude relevant mitigating evidence at the mitigation phase of Appellant's capital trial.  U.S. Const. Amends.  V, VIII, XIV; Ohio Const. Art. I §§ 1, 2, 5, 10, 16.

---

[3]     Rule 26(B) of the Ohio Rules of Appellate Procedure states in pertinent part:
     **Section 6.  Application for reopening**
     (A) an appellant in a death penalty case involving an offense committed on or after January 1, 1995, may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel in the Supreme Court.
Supreme Ct. Prac. R. XI(6).  Because capital defendants whose crimes were committed after January 1, 1995, appeal their conviction and sentence directly to the Ohio Supreme Court, rather than to the Ohio Court of Appeals, this Rule was meant to provide such defendants a forum in which to assert ineffective assistance of appellate counsel.

6.      Trial counsel rendered prejudicially ineffective assistance by not proffering improperly excluded mitigating evidence at the mitigation phase of his capital trial.  U.S. Const. Amends. V, VI, XIV; Ohio Const. Art. 1 §§1, 2, 5, 10, 16.

7.      Trial counsel rendered prejudicially ineffective assistance by erroneously advising Appellant regarding his unsworn statement at the mitigation phase of his capital trial.  U.S. Const. Amends. V, VI, VIII, XIV; Ohio Const. Art. 1 §§ 1, 2, 5, 10, 16.

8.      Trial counsel rendered prejudicially ineffective assistance by not challenging for cause a juror who had worked with the victim's family thereby depriving Appellant of a fair and impartial trial.  U.S. Const. Amends. V, VI, XIV; Ohio Const. Art. I §§ 1, 2, 5, 10, 16.

9.      It is prejudicial error for a trial court not to dismiss the alternate jurors when the jury retired to consider its verdict, and the court thereby violated Appellant's right to a fair trial, due process of law, and Crim. R. 24(F).  U.S. Const. Amends. V, VIII, XIV; Ohio Const. Art. I  §§ 1, 2, 5, 10, 16.

*Return*, Apx. Vol. 8, at 323-32.  On July 14, 2004, the Ohio Supreme Court denied Scott's application to reopen.  *Return*, Apx. Vol. 8, at 338.

### III. Federal Habeas Corpus Proceeding

Scott filed a Notice of Intent to File a Habeas Corpus Petition on March 15, 2007.  (Doc. 1). Concurrently, he filed a Motion for Appointment of Counsel, (Doc. 2), which the Court granted on April 13, 2007, appointing David L. Doughten and Jeffrey J. Helmick to represent Scott.  (Doc. 4). He filed a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 on June 11, 2007. (Doc. 12).  The Respondent thereafter filed a Return of Writ, (Doc. 15), to which Scott filed a Traverse on September 24, 2007. (Doc. 47).  The Respondent thereafter filed a Sur-Reply, rendering this matter ripe for disposition.  (Doc. 48).

In the Petition, Scott raises the following 15 grounds for relief:[4]

---

[4]      The grounds for relief are misnumbered in the Petition.  For purposes of clarity, the court re-numbers the grounds for relief in the order in which they are

11

1.    Petitioner Scott's convictions and sentences are void and/or voidable because pretrial publicity denied Scott his right to a fair and impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. *Irvin v. Dowd*, 366 U.S. 717 (1961).

2.    Petitioner Scott's convictions and sentences are void and/or voidable because victim impact evidence in the form of family and media demands for the death sentence contaminated the jury, thus denying Scott the right to have the sentencing decision made by the jury and as guaranteed by the Eighth Amendment to the United States Constitution.

3.    Petitioner's rights were violated by the joinder of two unrelated murders: one count of murder for the killing of Dallas Green and two counts of aggravated murder for the killing of Ryan Stoffer. Trial counsel filed a timely motion to sever these counts and provided information sufficient to demonstrate the prejudice to Petitioner. The trial court denied Petitioner's motion, and this joinder and denial of severance cause him prejudice and violated his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

4.    Petitioner Scott's conviction and/or sentence are void or voidable because he was inappropriately charged, convicted and sentenced under a "court-of-conduct" aggravator arising from the deaths of Ryan Stoffer and Dallas Green. Eligibility for the death penalty in Ohio, and any other state, requires that the class of offenses be sufficiently narrowed. In this case, application of the "course-of-conduct" aggravator was improper and violated Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

5.    The failure of defense counsel to adequately represent the Petitioner at the culpability phase or guilt-innocence determination phase of trial resulted in a sentence of death that does not comply with the minimum constitutional standards of reliability required for a conviction or the imposition of a death sentence, thus depriving Scott of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

6.    The trial court committed prejudicial error by failing to dismiss the alternate jurors as mandated by Ohio law, in violation of Petitioner's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Ohio Crim. R. 24(F) mandates that alternate jurors be dismissed at the

---

presented.

12

commencement of trial phase deliberations. *Ohio v. Gross*, 97 Ohio St.3d 121 (2002). Dismissal of jurors under the Ohio criminal rules protects the right to a fair trial and to due process of law.

7. Petitioner Scott's convictions and/or sentences are void and/or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth, Eight, Ninth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

8. Petitioner's death sentence is void or voidable because the trial court excluded relevant testimony from his mitigation hearing, thereby violating Petitioner's rights under the Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

9. The definition of "reasonable doubt" provided to the jury during Scott's capital murder trial violated his due process rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10. Petitioner Scott was denied effective assistance of appellate counsel. Once a state has provided the right to appeal to a criminal defendant, that defendant is afforded the right to effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 587 (1985). This right was effectuated in Ohio through the rule of *Ohio v. Murnahan*, 63 Ohio St.3d 60 (1992), which established that Ohio recognizes that the right to effective assistance of counsel continues through the first appeal of right.

11. The Petitioner was charged with capital offenses in Counts Two and Three of his Indictment, Aggravated Murder with prior calculation and design in violation of O.R.C. 2929.01(A) and felony/murder in violation of O.R.C. 2929.07(A)(7). Specification One alleged the homicide was committed during the commission of an Aggravated Robbery in violation of O.R.C. 2911.01 and Specification Two charged the homicide during the commission of Kidnapping, O.R.C. 2905.01.

12. Appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman v. Georgia*, 408 U.S. 238 (1972). The teaching of *Furman* was that a state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Id.* at 309-10 (Stewart, J. concurring).

13

Therefore, some form of meaningful appellate review is required to assess the sentencer's imposition of the death penalty.

13.     The effect of cumulative error during the trial deprived Scott of a fair trial. Pursuant to the cumulative error doctrine, the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial.

14.     The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.  U.S. Const. Amends. VIII, IX, XIV; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases.)

15.     Petitioner Scott challenges the various statutes used to convict and sentence him as violative of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

*See Petition*.

## IV. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Scott's petition was filed on June 11, 2007, the AEDPA governs this Court's consideration of his Petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and

14

federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)).

The requirements of the AEDPA "create an independent, high standard to be met before a federal

court may issue a writ of habeas corpus to set aside state-court rulings."   *Uttecht v. Brown*, 551

U.S.1, 10 (2007)(citations omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim --
>
> > (1)  resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the
> > facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a

consideration of both the state court's statement and/or application of federal law and its finding of

facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings,

as opposed to *dicta*, of the United States Supreme Court's decisions as of the time of the relevant

state-court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).

The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) are independent tests

and must be analyzed separately.  *Williams*, 529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d 706, 711

(6th Cir. 2003).  A state court decision is "contrary to" federal law only "if the state court arrives at

a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable

facts."  *Williams*, 529 U.S. at 412-13.

15

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413. A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711. As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)(citing *Williams*, 529 U.S. at 410). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that Section of 2254(d) in *Wiggins v. Smith*, 539 U.S. 510 (2003). In that case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29. In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only

16

be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary."). This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007)(citations omitted); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

### V. Exhaustion and Procedural Default

### A. Exhaustion

17

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982).  Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust*, 17 F.3d at 160.[5]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court."  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d

---

[5]    The court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Here, although the Respondent does not waive the exhaustion requirement, he concedes that the claims Scott raises in the petition are exhausted.  (Doc. 15, at 23).  The court performs no further exhaustion analysis on Scott's grounds for relief.

### B. Procedural Default

### 1. General Law

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar

19

test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's

failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is
> applicable to the petitioner's claim and whether the petitioner failed to comply with
> that rule. Second, the federal court must determine whether the state courts actually
> enforced the state procedural sanction -- that is, whether the state courts actually
> based their decisions on the procedural rule. Third, the federal court must decide
> whether the state procedural rule is an adequate and independent state ground on
> which the state can rely to foreclose federal review of a federal constitutional claim.
> Fourth, if the federal court answers the first three questions in the affirmative, it
> would not review the petitioner's procedurally defaulted claim unless the petitioner
> can show cause for not following the procedural rule and that failure to review the
> claim would result in prejudice or a miscarriage of justice.

*Williams*, 260 F.3d at, 693 (citing *Maupin*, 785 F.2d at 138)(further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last

explained state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205

F.3d 269, 275 (6th Cir. 2000). "[A] procedural default does not bar consideration of a federal claim

on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly

and expressly states that its judgment rests on a state procedural bar." *Morales v. Mitchell*, 507 F.3d

916, 937 (6th Cir. 2007)(quoting *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003)).

Conversely, if the last state court to be presented with a particular federal claim reaches the merits,

then the procedural bar is removed and a federal habeas court may consider the merits of the claim

in its review. *Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal

court may excuse the default and consider the claim on the merits if the petitioner demonstrates that

(1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by

the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar

on federal habeas review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp.2d 796, 801 (E.D. Mich., 2002). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp.2d at 801. Second, constitutionally ineffective assistance of counsel constitutes cause. *Murray*, 477 U.S. at 488-489; *Rust*, 17 F.3d at 161; *Mohn*, 208 F. Supp.2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause. *Murray,* 477 U.S. at 488-489. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental

21

miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004)(citing *Murray*, 477 U.S. at 495-96). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

### 2. The *Perry* Doctrine

Prior to reviewing the claims raised in the Petition, the Court first must address several arguments Scott raises in the Traverse regarding the holding issued in *State v. Perry*, 10 Ohio St.2d 175 (1967). He claims that on several grounds *Perry* is not "adequate" pursuant to the *Maupin* test and therefore should not be afforded deference by this Court.

In *State v. Perry*, 10 Ohio St.2d 175 (1967), the Ohio Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id.* at 108; *see also State v. Roberts*, 1 Ohio St.3d 36, 39 (1982) (holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* (outside of) the record, it must be raised during direct appeal, or be deemed waived.

### a. *Perry* not consistently applied

Scott argues in the Traverse that this Court may address any claim which the Ohio courts barred under the *Perry* doctrine because it is not an "adequate" rule under *Maupin*.  A procedural rule is not "adequate," unless, among other things, it is regularly and consistently applied.  *See Warner v. United States*, 975 F.2d 1207, 1213 (6th Cir. 1992) (stating that the rule only applies to "firmly established and regularly followed state practices.")(citing *Ford v. Georgia*, 498 U.S. 411, 422 (1991)).  Thus, Scott concludes, because of the Ohio courts' inconsistent application of *Perry*, this Court need not defer to an Ohio court's finding of a *Perry* violation.

To support his argument, Scott cites to several capital cases in which the Ohio Supreme Court, on direct appeal, *sua sponte* addressed the merits of claims the court of appeals had concluded were barred by *res judicata*, or considered claims that had not even been raised in the court of appeals and, thus, *should have been* barred by *res judicata*.

Some of the cases relied upon by Scott clearly do not support his argument and are, in fact, inapposite.  For instance, in each of the following three cases, a well-established exception to the *res judicata* doctrine applied, or the court did not actually engage in a merits review.  For example, Scott relies on *State v. Buell*, 22 Ohio St.3d 124, 142 (1986).  In *Buell*, the court analyzed the constitutionality of the imposition of the death penalty in light of the recently decided United States Supreme Court decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1987), even though the appellant did not raise the issue at trial, or in his appeal to the Ohio Supreme Court.  The reason the Ohio Supreme Court considered the claim *sua sponte* was that it *could not have been raised before*.  *Caldwell* was decided in 1985, after Buell's appeal had been filed and resolved by the Ohio Court of Appeals.

Similarly, in *State v. Huertas*, 51 Ohio St.3d 22 (1990), the Ohio Supreme Court resolved an issue and ultimately granted relief on the basis of a Supreme Court opinion, *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991), that was issued after the appellant's trial and after the appeal had been filed, but before the appellate court issued its decision. *Id.  Booth* held the use of victim impact evidence during the penalty phase of a capital trial is unconstitutional.  There is no indication in the opinion itself that the petitioner had failed to raise a claim based on the use of victim impact statements.  Thus, it is possible the *claim* had been raised below, even if the appellant could not have relief based on *Booth*.  Thus, *Huertas* is unhelpful to Scott.

Scott's reliance on *State v. Rogers*, 32 Ohio St.3d 70 (1987), suffers from the same defect.  The court considered a claim based on the prosecutor's evidentiary use of the petitioner's post-*Miranda* exercise of his right to silence, in violation of the recently decided *Wainwright v. Greenfield*, 474 U.S. 284 (1986).  As in *Huertas* and *Buell*, the United States Supreme Court decision was issued after the appellant's direct appeal to the Court of Appeals, and, thus, the appeal to the Ohio Supreme Court presented the earliest opportunity for raising the claim.

In other cases, however, the Ohio Supreme Court did appear to ignore the *res judicata* bar and address the appellant's claims on the merits without explaining why it was doing so.  *See State v. Williams*, 38 Ohio St.3d 346 (1988)("Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention.  In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties."); *State v. Hamblin*, 37 Ohio St.3d 153 (1988)("Because this is a capital case, we will review all five arguments [even those not raised below] relating to the claim

24

of ineffective assistance of counsel."); *State v. Esparza*, 39 Ohio St.3d 8 (1988)(considering issue of jury venire, even though it was "challenge[d] for the first time on appeal"); *State v. Barnes*, 25 Ohio St.3d 203 (1986)(stating, "since the instant argument was neither raised before, nor ruled on by, the court of appeals, this court is not required to address it on the merits," but addressing the claim anyway).[6]

That the Ohio Supreme Court occasionally chooses to address the merits of the claims that are otherwise barred from review on the basis of *res judicata* does not mean that Ohio's law of *res judicata* is so inconsistent as to be inadequate, however.  Rather, these are the exceptions that prove the rule.  There has been no showing that because of the above-mentioned exceptions, Scott or other capital habeas petitioners *reasonably* came to believe the *Perry* rule had been abandoned in capital cases.  Thus, there was no basis to conclude the exception had become the rule, or that it would have been reasonable for a petitioner to assume it had.[7]

Ultimately, Scott's argument is unpersuasive.  The Sixth Circuit has specifically held that

---

[6]   In virtually every case in which the Ohio Supreme Court has forgiven a procedural default, and addressed a claim on its merits, the court has concluded the claim was without merit.

[7]   The Ohio Supreme Court has expressly rejected the argument that procedural bars are or should be less strictly enforced in capital cases:

> The mere fact that punishments differ provides no basis to assert that procedural rules should differ in their application to the crime charged.  We hold that capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. . . . We will utilize the doctrine of waiver where applicable; yet we must also retain the power to *sua sponte* consider particular errors under exceptional circumstances.

*State v. Greer*, 390 Ohio St.3d 236, 244 (1988).

Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground. *Buell,* 274 F.3d at 349. *See also White v. Mitchell,* 431 F.3d 517, 527 (6th Cir. 2005)("We have generally recognized Ohio's *res judicata* ruling as an independent and adequate state ground to bar review of ineffective assistance claims on habeas.")(citation omitted); *Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999) (noting that the *Perry* rule has been consistently applied).  Thus, Scott's argument that the Ohio courts do not consistently apply *Perry* must fail.

### b. *Perry* as applied violates due process rights in state post-conviction proceedings

Scott also asserts a broad challenge to the constitutionality of Ohio's post-conviction system, contending that Ohio's post-conviction bar of *res judicata* does not satisfy due process requirements. According to Scott, Ohio's post-conviction system is designed to create procedural defaults for the sake of judicial convenience, and provides no meaningful opportunity for petitioners to identify, investigate, or prove constitutional violations.  The thrust of his argument seems to be that Ohio's post-conviction practice makes compliance with its procedural requirements so difficult that petitioners are set up for failure.  This argument is unpersuasive.

In support of his argument, Scott relies on *Easter v. Endell*, 37 F.3d 1343, 1345 (8th Cir. 1994); *Harmon v. Ryan*, 959 F.2d 1457, 1462 (9th Cir. 1992); and *Kim v. Villalobos*, 799 F.2d 1317, 1321 (9th Cir. 1986).  None of these cases supports Scott's argument that Ohio's application of *res judicata* in post-conviction proceedings violates due process.

In *Easter*, the petitioner pled guilty to various crimes in an Arkansas state court in December of 1989.  At the time, Arkansas did not allow those who pleaded guilty to appeal; in addition, Arkansas had no real post-conviction system in place.  A year after Easter's guilty plea and conviction, Arkansas enacted a post-conviction procedure (Rule 37) that allowed for the review of

26

guilty pleas.  However, petitions containing such challenges were required to be filed within ninety (90) days of judgment.  The Arkansas Supreme Court subsequently held that individuals who had pleaded guilty during the period in which Rule 37 was *not* in effect had a right to challenge their guilty pleas under the rule.  *State v. Fox*, 832 S.W.2d 244 (Ark., 1992), *overruled by Cherry v. State*, 918 S.W.2d 125 (Ark., 1996).  The Arkansas Supreme Court also said, however, that such challenges still had to be made within the ninety (90) day period.  Easter filed a Rule 37 petition, and it was denied as untimely.  Easter raised a challenge to his guilty plea on federal habeas review, and the district court held that the claim was procedurally defaulted.

The Eighth Circuit Court of Appeals reversed.  The court held that the *Fox* procedural bar was not adequate *as to Easter*,[8] because it was not a firmly established rule when applied to him.[9] In this case, Scott has not shown that any of his procedural defaults were due to a procedural rule that was not firmly established at the time it was applied to him.[10]

*Harmon* also offers no support for Scott's claim.  In *Harmon*, the district court dismissed the petitioner's habeas corpus petition because he had failed to pursue a direct appeal in the Arizona Supreme Court first.  The Ninth Circuit reversed, holding, basically, that the Arizona Supreme Court

---

[8]     The Court was careful to point out that "Arkansas' post-conviction procedures as embodied by *Fox* are not *in themselves* constitutionally infirm."  *Easter*, 37 F.3d at 1346.

[9]     This was an application of the Supreme Court's decision in *Ford v. Georgia*, 498 U.S. 411 (1991)(holding that a state procedural rule that was not clearly defined before the default is not an adequate state ground for purposes of determining procedural default).

[10]    *Pearson v. Norris*, 52 F.3d 740 (8th Cir. 1995), also involved Arkansas Rule 37.  In *Pearson*, the Court held that, because any attempt by the petitioner to file an untimely Rule 37 petition would be rejected by the Arkansas courts, the claim should be addressed by the federal district court on the merits.

27

had misled the petitioner about what he needed to do to exhaust his state remedies.  The Ninth Circuit held that the petitioner's default was due to the fact that, prior to its occurrence, the Arizona Supreme Court expressly held that "'[o]nce the defendant has been given the appeal to which he has a right [*i.e.*, in the state intermediate appellate court], state remedies have been exhausted.'" *Harmon*, 959 F.2d at 1463 (quoting *State v. Shattuck*, 684 P.2d 154, 157 (Ariz. 1984)).  Thus, the Ninth Circuit concluded, in light of *Shattuck*, it was reasonable for an Arizona defendant to believe that an appeal to the Arizona Appeals Court was all that was needed to exhaust his state remedies before pursuing a federal habeas action, and the failure to appeal to the Arizona Supreme Court was excused.  Here, Scott has not pointed to a single decision that misled him about his obligations.

Likewise, *Kim* does not assist Scott.  In *Kim*, 799 F.2d at 1321, the Ninth Circuit held that, where a *pro se* prisoner's failure to plead his claims with particularity resulted in his being unable to pursue post-conviction relief, the procedural default would be excused.  Here, there is no such obstacle to Scott, who was represented by counsel throughout his appeal and post-conviction proceedings.  Accordingly, this argument fails.

### c. No *res judicata* when claim based on evidence outside record

Finally, Scott asserts that this Court should excuse any procedural default for claims barred by the *Perry* doctrine if they are based on evidence *dehors* the record.  The Court declines to express a general conclusion regarding this issue and will address this argument as it is raised in regard to Scott's individual grounds for relief.

### VI. Analysis of Grounds for Relief

### A. First and Second Grounds for Relief: Change of Venue and Victim-Impact Evidence Based on Pre-Trial Publicity

Scott contends that the trial court erred when it failed to grant defense counsel's motion for

28

a change of venue based on the local media's attention to the "test-drive murder." He claims that seven of the 12 jurors who sat in judgment of him revealed during *voir dire* that they had been exposed to media attention surrounding the murders. He argues that the extensive media attention to his case led to "an inflamed community atmosphere" that prejudiced the outcome of his trial. *Petition*, at 9. He also contends that Green's family members' statements to the media tainted the jurors, many who admitted to exposure to pre-trial publicity.

The Respondent asserts these claim are procedurally defaulted. Although Scott raised them as his first and third grounds for relief in the post-conviction relief petition, *Return*, Apx. Vol. 9, at 29, the Fifth District Court of Appeals held that these claims were barred by *res judicata*. *State v. Scott*, No. 2005CA00028, 2006 WL 173171 (Ohio Ct. App. Jan. 23, 2006). Observing that the trial court record included *voir dire* transcripts in which individual jurors were questioned about their exposure to the trial publicity, the jurors' completed questionnaires, and the trial court's ruling on a motion regarding pretrial publicity, the Fifth District held that this issue should have been raised on direct appeal. *Id.* at *6.

Scott counters that the pre-trial publicity issue should not have been barred by the post-conviction courts because it involves issues *de hors* the record. Alternatively, he requests that if the Court finds this claim to be procedurally defaulted, he should be entitled to discovery to develop the "prejudice" necessary to excuse the default. He asserts that he can establish "cause" because of the ineffective assistance of appellate counsel.

The Court finds that further factual development on the procedural default issue is unnecessary. First, as is stated below, Scott cannot substantiate his claims of ineffective assistance of appellate counsel. Thus, he cannot use this claim to excuse his failure to raise the pre-trial

publicity issue on direct appeal.  Moreover, Scott has not specified precisely what discovery he would seek to establish prejudice or how it would corroborate his assertions.  Finally, while Scott asserts his claims are based on evidence outside the record, he does not, as he cannot, articulate why the Fifth District Court of Appeal's enumeration of materials contained within the trial record, and its subsequent assertion that these claims should have been raised on direct appeal, is erroneous.  Accordingly, the Court finds these claims to be procedurally defaulted.

The claims also are without merit.  The United States Supreme Court determined in *Irvin v. Dowd*, 366 U.S. 717 (1961), that finding a jury totally ignorant of a case is difficult.  In that case, the Court held that:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in a criminal case.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption or a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722-23.

Following this precedent, the Sixth Circuit has held that it is sufficient if a juror who has formed an impression as to guilt or innocence from pre-trial publicity can put aside that impression and render a verdict based solely on the evidence.  *Kelly v. Winthrow*, 25 F.3d 363, 368 (6th Cir. 1994).  Consequently, a petitioner typically must point to actual prejudice to succeed on a change of venue claim.  Negative media coverage, *per se,* does not establish actual prejudice and "a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to

rebut the presumption of impartiality." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007), *cert denied*, 533 U.S. 1068 (2008).

In rare cases, courts have presumed that media attention prejudiced a petitioner's trial. *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Rideau v. State of Louisiana*, 373 U.S. 723 (1963). The Sixth Circuit has explained, however, that those cases involved particular circumstances, such as when a defendant's confession was televised or when the media persistently labels a defendant a "killer." *DeLisle v. Rivers*, 161 F.3d 370, 384-86 (6th Cir. 1998). As the Sixth Circuit noted, cases in which prejudice is presumed occurs only where "'the general atmosphere in the community or courtroom is sufficiently inflammatory.'" *Id.* at 382 (quoting *Murphy v. Florida*, 421 U.S. 794, 802 (1975), *abrogated on other grounds by Harris v. Stoval*, 212 F.3d 940, 942-43 (6th Cir. 2000)).

In the instant case, Scott can neither establish actual prejudice nor support an assertion that prejudice may be presumed based on the inflamed atmosphere surrounding the trial. Although Scott cites to several points during *voir dire* that panel members who were eventually seated as jurors admitted that they were exposed to pre-trial publicity, each stated that he or she could set aside any impressions regarding the case they had learned from these reports and base their deliberations on the evidence presented during trial. In fact, several of the venire members Scott argues were biased based on media reports stated during *voir dire* that they did not actually recall the content of the material they viewed. *See, e.g., Return*, Trial Tr. Vol. 4, at 822.[11]

---

[11]    The Court:    [T]he pretrial publicity sheet indicates that you probably read something about this in the newspaper, but, as I understand it, do not recall any specifics of the case at all. Is that correct?

            Juror 408:    That's correct.

Even the jurors who Scott argues had a particularized memory of the case stated that they could render their decision based solely on the evidence presented at trial.  One juror, who had worked with a cousin of one of the victims, admitted that he attempted to call his former co-worker when he first heard about the murder.  *Return*, Trial Tr. Vol. 3, at 479.  After revealing to the trial court that he was unsuccessful in his attempts, he responded that this former association would not interfere with his ability to be impartial.  *Id.*  Another juror stated that he had showed a newspaper article on the murders to a friend and joked that he may end up on the jury before he knew he might actually be seated.  *Id.* at 726.  This venire member also responded that he could put aside any impressions of the case he may have formed through media reports when deciding the case when questioned by the trial court.  Defense counsel did not use peremptory challenges to excuse any of the jurors Scott now insists were biased against him.  *Return*, Apx. Vol.16, at 33-40.  Thus, Scott has not proven that any jurors were actually prejudiced against him.  Additionally, he has not demonstrated that the pre-trial publicity or courtroom atmosphere was so "inflammatory" that prejudice should be presumed.  The Court therefore finds that Scott's first and second grounds for relief lack merit.

### B. Third and Fourth Grounds for Relief - Misjoinder and Course of Conduct Aggravating Factor

In these interrelated grounds for relief, Scott asserts that the trial court improperly joined the two murders during the culpability phase of trial.  Moreover, he contends that the manner in which the Ohio Supreme Court applies the "course of conduct" aggravating factor[12] is unconstitutional and

---

[12]    That statute states:

> (5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the

requires habeas relief.  He asserts that the Ohio Supreme Court has applied it, as it did here, in instances where there was no connection between the murders.  Scott concedes in the Traverse that if the Court finds that the Ohio Supreme Court correctly found the course of conduct aggravating factor to be applicable to his case, then ground for relief three would have no merit.[13]  Accordingly, the Court will first consider ground four. The Court will consider the procedural default of this claim in the fourth ground for relief.

### 1. Fourth Ground for Relief

### a. Procedural Default

Scott did not raise this issue on direct appeal to the Ohio Supreme Court.  Instead, he raised a related issue – whether there was sufficient evidence with respect to each capital specification. Although Scott asserts that the Ohio Supreme Court raised the constitutionality issue of the aggravating factor *sua sponte*, it was not the majority opinion but Justice Pfeifer's dissent that did so.  Thus, the Court finds that the controlling authority, *i.e.*, the majority opinion, did not raise the issue.  This Court therefore cannot excuse Scott's procedural default on these grounds. This ground does not present the Court with the situation adjudicated upon in *Ylst*, 501 U.S. at 801, in which a state court addresses the merits of a claim, excusing any procedural default thereby.

---

purposeful killing of or attempt to kill two or more persons by the offender.
Ohio Rev. Code  2929.04(A)(5).

[13]  Scott rightfully concedes this point because if the aggravating factor were correctly utilized in his case, then evidence of both murders would be admissible during trial because it would be necessary to prove the death specification.  That reasoning was precisely why the trial court denied defense counsel's motion to sever. *See Return*, Apx. Vol. 3, at 102 (finding that "[s]ince the state is required under the indictment and specification to introduce evidence of both crimes and would be permitted to offer evidence of such even if the charges were separated, the Court finds that joinder of both charges is permissible.").

33

Scott also raised this issue in his application to reopen his direct appeal.  The Sixth Circuit has held, however, that a habeas claim is exhausted only if it is raised under the same theory in federal court as it was in state court.  *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003).  Thus, the factual underpinnings of this ground for relief are not ripe for habeas review because they were not presented to the state courts under the identical legal theory as Scott raises them here.  Accordingly, the Court finds this ground for relief to be procedurally defaulted.

## b. Merit Review

Even if not defaulted, this claim would lack merit. The United States Supreme Court has held that the Constitution requires aggravating circumstances listed in a state's death penalty statutes to narrow the class of death-eligible individuals, differentiating them from those who are not death-eligible. *Zant v. Stephens*, 462 U.S. 862 (1983).  The Supreme Court has given states wide latitude in determining the means by which to narrow this class.  In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court articulated the necessary criteria for an aggravating circumstance to be constitutionally sound.  First, the circumstance may not be one that would apply to every murder but must be an applicable  "subclass" of convicted defendants.  *Id.* at 972 (citing *Arave v. Creech*, 507 U.S. 463, 474 (1993).  Moreover, the *Tuilaepa* Court found that the aggravating circumstance may not be "unconstitutionally vague." *Id.* (*Godfrey v. Georgia*, 446 U.S. 420, 428 (1980), *Arave*, 507 U.S. at 471, further citations omitted).

As to what constitutes "vagueness," the Court held that its review is "quite deferential." *Id.* at 973.  In accordance with this deferential standard, the Court opined that an aggravating

34

circumstance will pass constitutional muster if it has "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Id.* at 974 (quoting *Jurek v. Texas* 428 U.S. 262, 279 (1976)).  The *Tuilaepa* Court thereafter concluded that the California aggravating circumstances at issue in the case complied with the vagueness requirement, finding that the circumstances of the crime were acceptable factors for juries to consider.

Using these guidelines, the Court now must examine the manner in which the Ohio Supreme Court has applied the course of conduct specification.  The principal case on this issue is *State v. Benner*, 40 Ohio St.3d 301 (1988).  There, the defendant committed two rapes and a rape/homicide in the span of four months.  His indictment included the course of conduct specification by which he was later sentenced to death.  On appeal to the Ohio Supreme Court, the defendant alleged that R.C. 2929.04(A)(5) was constitutionally void on vagueness grounds.  The Ohio Supreme Court rejected this argument, finding that the course of conduct specification was dissimilar to cases in which the United States Supreme Court found that the aggravating factor could apply to every murder and was therefore unconstitutionally vague.  It held:

> We believe that if appellant's vagueness argument is based on the possibility of differing interpretations of the term 'course of conduct,' it is misdirected since such a possibility is not the correct test for vagueness in capital cases. 'Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia* [ (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346] * * *.' *Maynard v. Cartwright* (1988), 486 U.S. 356, ----, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372, 380.
>
> The R.C. 2929.04(A)(5) course-of-conduct specification is not the type of "open-ended" statute struck down in *Maynard, supra*, and *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d

35

398. In *Godfrey*, the court found that an aggravating circumstance for murders that were 'outrageously or wantonly vile, horrible or inhuman' did not adequately channel jury discretion: 'A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible or inhuman.'' *Id.* at 428-429, 100 S.Ct. at 1764-1765. Similarly, in *Maynard*, the court struck down an aggravating circumstance provision referring to 'especially heinous, atrocious or cruel' murders, on the basis that 'an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'' 486 U.S. at ----, 108 S.Ct. at 1859, 100 L.Ed.2d at 382.

Turning to the statute assailed sub judice, it is clear that no one could reasonably believe that every murder is "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." Thus, we find that the specification R.C. 2929.04(A)(5) does not give the sentencing court the wide discretion condemned in both *Godfrey* and *Maynard*. Therefore, we hold that the course-of-conduct specification is not void for vagueness under either the Eighth Amendment of the United States Constitution or Section 9, Article I of the Ohio Constitution. The language of the statute is definitive and is circumscribed to cover only those situations which it fairly describes.

*State v. Benner*, 40 Ohio St.3d at 305. Using the correct United States Supreme Court test, the Ohio Supreme Court found that R.C. 2929.04(A)(5) sufficiently directed a capital sentencer about what facts it must find to find the existence of the course-of-conduct aggravating circumstance. Thus, the court found it complied with the requirements of the Eighth Amendment by sufficiently narrowing the class of capital defendants who would be eligible to have this aggravating circumstance found.[14]

The *Scott* court also held that the course-of-conduct aggravating circumstance was appropriate in Scott's case. It reasoned:

---

[14]    In denying Benner's habeas corpus petition, another judge on this Court found that the Ohio Supreme Court's reasoning was not an unreasonable application of any United States Supreme Court precedent. *Benner v. Coyle*, No. 1:98CV693, Doc. No. 34, at 37 (N.D. Ohio Feb. 24, 1999)(Gaughan, J.).

> Here, after killing Green, Scott threatened to kill Wilson and Allen if they told anyone about the murder; both testified that they had failed to report that killing because they had feared for their safety. Scott later bragged to Jewell that he had killed Green.
>
> On several occasions after the Green killing, Scott told his friends that he planned to test drive a vehicle, kill the owner, and take the car. He then induced one of his girlfriends to help him carry out his plan; he killed Stoffer and, thereafter, told Jewell that he had done so. And, he also threatened to kill his own brother, Anthony, and Anthony's girlfriend and children after Anthony provided incriminating evidence to police.
>
> While Scott argues that killing Green was separate and distinct from killing Stoffer, the pattern of conduct he exhibited in the spontaneous execution of Green for no apparent reason, his bragging about that killing, and the threats he made to those who could report it, combined with his forecast of the Stoffer murder, the cold-blooded manner in which he carried it out, the threats he made surrounding that killing, and his bragging to Jewell about it, all suggest a deliberate effort by Scott to earn a reputation as an indiscriminate killer bent on enhancing his influence in the community by causing others to fear him. Accordingly, construing the evidence most strongly in favor of the state, a rational trier of fact could have found Scott guilty of the course-of-conduct specification, and therefore, the trial court did not err in overruling Scott's challenge to the sufficiency of that evidence.

*State v. Scott*, 101 Ohio St.3d 37-8 (2004). Thus, the *Scott* court found that the course-of-conduct capital specification is applicable because Scott's murders of Green and Stoffer and statements before and after they occurred was an effort to tout his tough reputation in his neighborhood.

As noted above, Scott cites to Justice Pfeiffer's dissent, in which he opines that "the only thing the two murders had in common was the murderer." *Id.* at 51. He concludes that, unlike other cases in which he found the course-of-conduct specification to be appropriate, it was not in this instance. *Id.* While the dissent's argument is not without merit, it does not constitute the binding opinion that this Court should subject to AEDPA scrutiny. The Ohio Supreme Court's majority opinion upholding the use of the specification does not run afoul of the Eighth Amendment pursuant to the *Tulaepa* test. First, it clearly does not apply to every murder because, by definition, a criminal

37

defendant must be accused of committing two or more murders for this specification to apply. Second, while the Ohio Supreme Court has broadly applied this eligibility factor, its scope is not so unconstitutionally broad as to be unconstitutional. A reasonable capital factfinder could understand that there must be some connection, whether temporal, physical, or to promote some common purpose, in order to find the presence of this aggravating circumstance. Given this interpretation and the highly deferential standard of review that *Tuilaepa* instructs this Court to utilize, the Court finds Scott's fourth ground for relief has no merit.[15]

### C. Sixth, Eighth, and Eleventh Grounds for Relief - Trial Court Error

In these grounds for relief, Scott asserts that the trial court erred by failing to follow a state rule of procedure, failing to admit evidence during the sentencing phase of the proceedings, and failing to merge the aggravating factors pursuant to Ohio law. The United States Supreme Court has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a

---

[15]  As Scott concedes, the Court's finding that his fourth ground for relief has no merit renders his third ground for relief moot. For purposes of judicial economy and appellate review, however, the Court finds the following: The third ground for relief is procedurally defaulted because it was first raised an ineffective assistance of appellate counsel claim in Scott's application to reopen his direct appeal. Thus, it was not raised under the same theory in state court as Scott raises it here. *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002). While Scott asserts that the dissent raised the issue of joinder *sua sponte*, the Court finds that, because the majority did not raise it, the issue is defaulted.

Moreover, this claim lacks merit. As the Sixth Circuit recently held that while it was "skeptical" about whether Ohio's joinder provisions protect a capital defendant from prejudice, it concluded that "a habeas corpus proceeding is not an appropriate vehicle for this court to substitute its own judgment for that of the State of Ohio." *Davis v. Coyle*, 475 F.3d 761, 778-9 (6th Cir. 2007).

conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68 (citations omitted); 28 U.S.C. § 2254(a).  The job of a federal court addressing state evidentiary issues is limited to a determination whether a state court's failure to follow some rule of procedure or admission of evidence violated the petitioner's right to due process and a fair trial.  *Id.*  A trial may be deemed fundamentally unfair if it can be shown by a reasonable probability that the outcome would have been different without admission of the evidence or if there is a basis upon which to conclude that the result was unreliable.  *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993).  The *Estelle* Court noted that the category of infractions that violate fundamental unfairness is a narrow one. *Id.*(citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  With this guidance, the Court now turns to Scott's grounds for relief.

### 1. Sixth Ground for Relief - Failure to Dismiss Alternate Jurors

Scott contends that the trial court erred when it failed to dismiss the alternate jurors prior to the culpability phase deliberations.  He argues that Ohio Rule of Criminal Procedure 24(F) required this dismissal, and the trial court's failure to comply with this rule invaded the sacrosanct privacy of jury deliberations, rendering his trial fundamentally unfair.[16]

The Respondent claims that this ground for relief is procedurally defaulted because Scott did not raise it until filing an application to reopen his direct appeal.  As stated above, a habeas claim is exhausted only if it is raised under the same theory in federal court as it was in state court. *Lorraine*, 291 F.3d at 425.  Because Scott raised this claim as an ineffective assistance of appellate

---

[16]     That Rule requires that, in a capital case, "[a]ny alternate juror shall be discharged after the trial jury retires to consider the penalty."  Ohio R. Crim. P. 24(F)(2).  In 2008, the Rule was amended to allow the option of retaining alternate jurors during any deliberations and substituting an alternate in the middle of deliberation.

counsel claim in state court, but as a trial court error claim in his federal habeas petition, the Court finds this ground for relief is procedurally defaulted.

Scott maintains he can overcome any procedural default.  He asserts that he can establish the requisite "cause" to excuse this default based on appellate counsel's ineffectiveness.  While ineffective assistance of appellate counsel can serve as "cause" to excuse a procedurally defaulted claim, a habeas petitioner must demonstrate that he received ineffective assistance of appellate counsel that rose to the level of a Sixth Amendment violation to use this claim as "cause" to overcome the procedural default hurdle.  *Martin v. Mitchell*, 280 F.3d 594 (6th Cir. 2002)(citing *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000).  Specifically, the Petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Second, the petitioner must show that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  As the Court discusses below in its review of the merits of this claim, Scott cannot establish that he would have prevailed on this ground for relief even if he had preserved it for federal habeas review.  Scott therefore cannot establish the prejudice necessary to excuse his procedural default.

Even if this claim were not defaulted, it would not be well-taken.  In *United States v. Olano*, 507 U.S. 725 (1993), the United States Supreme Court reviewed a similar claim in a case where a defendant raised an issue involving an analogous Federal Rule of Criminal Procedure.  There, the trial court permitted the alternate jurors to sit in on, but not participate in, the jury's deliberations,

over defense counsel's objections.  On appeal, the defendant argued that the presence of the alternate jurors in the deliberation room was prejudicial because the alternates actually may have participated in the deliberations with the regular jurors or that their mere presence produced a "chilling effect" on them.  *Id.* at 739.

The Supreme Court disagreed.  After reviewing cases in which it held that prejudice could be presumed, it found that the alternates were indistinguishable from the regular jurors up until the deliberations.  Moreover, it observed that the trial court instructed the alternates not to participate in deliberations.  Consequently, the *Olano* Court held, there was no reason to suspect that the alternates actually influenced the jury's deliberations.  Finally, the Court found that the mere presence of the alternates in the deliberation room was insufficient to establish a "chill" on jury deliberations to justify a presumption of prejudice.  *Id.* at 741.  Accordingly, the *Olano* Court found that, while plain error may have occurred, it did not affect the defendant's "substantial rights."  *Id.*

The factual circumstances of *Olano* are quite similar to those presented here.  During a conference with counsel outside the presence of the jury, the trial judge indicated his intentions of apparently permitting the alternates to listen to the jury's deliberations from outside the deliberation room:

| | |
|---|---|
| Defense Counsel: | Your Honor, did we make provisions for the alternate jurors to hear this separately? |
| The Court: | Yes. |
| Defense Counsel: | Oh, okay. |
| The Court: | What I thought I would do, I don't necessarily want to indicate that |

41

> so that the audience is aware that someone will be listening to
> deliberations, but we have made such arrangements; and I thought
> when we get done with reading the instructions, I will send the
> regular 12 members of the jury out and ask the alternates to remain
> and merely instruct them that because there may be of [sic] some
> necessity or illness or some other emergency required that it will be
> necessary that they remain under the jury service and follow the
> instructions of the Bailiff; and then I will let the Bailiff take them out.

*Return*, Trial Tr., Vol. 10, at 692.  After charging the jury just prior to their deliberations, it appears that the trial judge followed through with his intentions.  While nothing in the record indicates that the alternates listened to the jury deliberations from a remote location, the trial court instructed the alternates to "follow the Bailiff and follow her instructions relative to your conduct and where you will be and things of that nature."  *Id.* at 762.

While the *Olano* case reviewed the analogous Federal Rule, the Court finds its reasoning to be applicable here.  Similar to the facts in *Olano*, the trial court here permitted the alternates access to the jury's deliberations.  As *Olano* instructs, however, that fact alone did not prejudice Scott's trial.  Instead, Scott must demonstrate that the alternates actually influenced the deliberations to demonstrate prejudice.  Because the alternates here actually were outside the presence of the jury, there is no means by which they could have participated in the deliberations or had a "chilling effect" on the jurors.  Accordingly, while the trial court may not have complied with Ohio Rule of Criminal Procedure 24(f), its failure to dismiss the alternates does not warrant federal habeas relief.  Moreover, the Ohio Criminal Rules now allow the retention of alternate jurors. Ohio Crim. R. 24(G).

42

## 2. Eighth Ground for Relief - Admission of Mitigating Evidence

Scott asserts the trial court erred when it prohibited him from presenting evidence regarding: (a) his mother's attempt to kill her mother; (b) the jury's sentencing options; and (c) a poem his brother wrote about him.  The Respondent maintains that each sub-claim is procedurally defaulted. First, he asserts that sub-claim (a) was not raised on direct appeal.  Instead, Scott raised the claim in the petition for post-conviction relief.  On appeal from denial of relief, the Fifth District Court of Appeals held that the claim was barred by *res judicata* because the exclusion of this evidence was cognizable on direct appeal.  *State v. Scott*, No. 2005CA00028, 2006 WL 173171, at *6 (Ohio Ct. App. Jan. 23, 2006).  Thus, sub-claim (a) is procedurally defaulted.  Scott did not raise sub-claims (b) and (c) until he filed an application to reopen his direct appeal.  While Scott's failure to raise these claims under the same theory in state court as they are presented here typically would render them both procedurally defaulted, the Court observes that the on direct appeal, the Ohio Supreme Court *sua sponte* addressed the subject matter of sub-claim (b), finding that the trial court properly excluded any evidence regarding the jury's sentencing options.  *State v. Scott*, 101 Ohio St.3d 31, 43 (2004).  If the highest court of a state provides a *sua sponte* opinion on an issue not raised, then the default is forgiven.  *Ylst*, 501 U.S. at 801.  Thus, sub-claim (b) is not procedurally defaulted.

These claims lack merit in any event.  Scott alleges that the trial court violated the United States Supreme Court's holding in *Lockett v. Ohio*, 438 U.S. 586 (1978), by failing to admit the evidence counsel proffered.  Scott's reading of the *Lockett* holding, however, is misplaced.  In *Lockett*, the Supreme Court held that any death penalty statute must allow the sentencer to review all relevent, mitigating evidence during the penalty phase, thereby fashioning a sentence befitting

the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence.  *Id.* at 605.

Although the *Lockett* Court required juries to consider all evidence the defense introduces during the penalty phase of a capital trial, it did not enunciate any standard by which a trial court should find such evidence to be admissible.  The Supreme Court addressed that issue in its subsequent decision, *Romano v. Oklahoma*, 512 U.S. 1 (1994).  The *Romano* Court clearly refused to impose such a standard, opining:

> Petitioner's argument, pared down, seems to be a request that we fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern the admissibility of evidence at capital sentencing proceedings.  We have not done so in the past, however, and we will not do so today.  The Eighth Amendment does not establish a federal code of evidence to supercede state evidentiary rules in capital sentencing proceedings.

*Id.* at 11-12.  Thus, contrary to Scott's assertion, the Supreme Court overtly has held that the issue of the admissibility of evidence in capital sentencing trials is one reserved specifically to a state's rules of evidence.  The issue of whether the evidence Scott asserts is mitigating was relevant is a decision for the trial court only.  Accordingly, the sub-claims presented in this ground for relief are not eligible for federal habeas review.  *Estelle*, 502 U.S. at 67-68.

### 3. Eleventh Ground for Relief -Failure to Merge Statutory Mitigating Factors

Finally, Scott asserts that the trial court erred when it failed to merge two of the capital specifications.  He maintains that the State set forth insufficient evidence of the kidnapping of Stoffer and, thus, the kidnapping specification should have merged with the aggravated robbery of Stoffer specification.  Scott claims that the failure to merge these aggravating factors was tantamount to a thumb on the scale weighing in favor of a death sentence.  Scott raised this claim on direct appeal to the Ohio Supreme Court.  It is therefore preserved for federal habeas review.

44

The Ohio Supreme Court found that this claim lacked merit, finding that the State had presented sufficient evidence to support a jury's finding of kidnapping as a distinct specification from aggravated robbery. It reasoned:

> Here, the record refutes Scott's sufficiency challenges. In addition to Scott's confession, in which he admitted driving around Canton with Stoffer for an hour and a half, while Stoffer kept directing Vadasz to drive toward his grandmother's house, killing him, and taking his vehicle, the state presented corroborating evidence of the kidnapping and the robbery. The state's evidence included the bloodstained seatbelt, Stoffer's body, the murder weapon, ammunition, the stolen vehicle, and testimony by Stoffer's mother that Stoffer anticipated that the test drive, transaction, and drive home from his grandmother's house would take less than an hour, all of which support the conclusion that, after construing that evidence most strongly in favor of the prosecution, a rational trier of fact could have found Scott guilty of the kidnapping and aggravated robbery specifications. *See State v. Lawson* (1992), 64 Ohio St.3d 336, 349, 595 N.E.2d 902 (prolonged restraint was not incidental to murder and clearly constituted a separate and distinct act).

*State v. Scott*, 101 Ohio St. at 37. Scott has not alleged, as he cannot, that the Ohio Supreme Court's finding that the State presented sufficient evidence of kidnapping was contrary to any United States Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). While Scott offers his assessment of whether he possessed the required separate animus for a jury to find him guilty of kidnapping, this Court's review is limited to an examination of the Ohio Supreme Court's findings. Those findings were not "unreasonable" as defined in the statute, because the court cited to evidence the State presented in finding that a jury could have found Scott intended to commit kidnapping. Accordingly, this Court's inquiry ends. Scott's claim is not well-taken.

### D. Ninth Ground for Relief - Reasonable Doubt Jury Instruction

In Scott's ninth ground for relief, he maintains that the trial court erred when charging the

45

jury on the definition of reasonable doubt. Scott raised this claim on direct appeal to the Ohio Supreme Court and it is therefore preserved for federal habeas review.

An incorrect jury instruction does not warrant federal habeas corpus relief if it was merely undesirable, erroneous, or universally condemned. Instead, the instruction must violate a constitutional right. *Estelle*, 502 U.S. at 72. On habeas review, a court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevented consideration of constitutionally relevant evidence. *Boyd v. California*, 494 U.S. 370, 380 (1990). The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire trial record. *Id.*

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155.

The Sixth Circuit has found that Ohio's statutory definition of reasonable doubt, the definition supplied by the trial court, is constitutional. *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000)(citing *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983)). To offend due process, the instruction must be of the type that could mislead the jury into finding no reasonable doubt when in fact there was some. *Holland v. United States*, 348 U.S. 121, 140 (1954); *Thomas*, 704 F.2d at 868. Here, the trial court merely read the statutory jury instruction that the Sixth Circuit has found constitutional. The instruction, thus, cannot be considered misleading. This ground for relief has

no merit.

### E. Fifth, Seventh, and Tenth Grounds for Relief - Ineffective Assistance of Counsel

Scott alleges in these ground for relief that his counsel were ineffective at various stages of their representation of him.  To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation "falls 'below an objective standard of reasonableness.'" *Murphy v. Ohio*, 551 F.3d 485, 496 (6th Cir. 2009), *cert.denied*, 130 S.Ct. 397 (2009) (quoting *Strickland*, 466 U.S. at 688).

The petitioner also must demonstrate that he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  A petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984), *overruled on other grounds, Sawyer v. Smith*, 492 U.S, 227 (1990).   Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689.   "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

47

conduct from counsel's perspective at the time.'" *Cone v. Bell*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

If a petitioner fails to prove either deficiency or prejudice, then the ineffective assistance of counsel claims must fail. *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)(citing *Strickland*, 466 U.S. at 697). Using the above standard, the Court now turns to Scott's individual allegations of ineffective assistance.

### 1. Fifth Ground for Relief - Ineffective Assistance During Culpability Phase

Scott claims that trial counsel were ineffective on four different occasions during the culpability phase of trial.[17] He asserts that counsel's conduct fell below professional norms, depriving him of the Sixth Amendment right to counsel when trial counsel failed to: (a) move for a change of venue; (b) object to evidence that he had sexual intercourse after killing Green; (c) move for a mistrial based on the conduct of the victim's family; and (d) object to the seating of a tainted juror.

The Respondent asserts that all but one of these sub-claims, sub-claim (b), were not raised, as they should have been, on direct appeal. Instead, Scott first raised the remaining sub-claims in his application to reopen the direct appeal. They were therefore raised under a different theory in state court– as ineffective assistance of appellate counsel claims – than Scott advances here. Accordingly, these claims are procedurally defaulted. *Lorraine*, 291 F.3d at 425.

Nevertheless, the Court will address the merits of these claims regardless of their defaulted status. Scott raised the factual underpinnings of sub-claims (a) and (d) in his first and second

---

[17]    Scott initially raised in the Petition a fifth instance of counsel's ineffectiveness for admitting Scott's guilt in the opening statement. He subsequently withdrew this claim in the Traverse. (Doc. No. 47, at 32).

grounds for relief. Because the Court found, *infra*, that these claims had no merit, it stands to reason that Scott cannot establish he was prejudiced by counsel's failures to act. These sub-claims are therefore without merit.

In sub-claim (b), the only sub-claim preserved for federal habeas review, Scott asserts that his counsel were constitutionally ineffective for failing to object to prejudicial evidence. Two witnesses for the State testified during trial that Scott had sexual relations on the night he killed Green. Scott maintains that this information was irrelevant and should have been excluded from the trial. He claims its introduction painted him as a cold-blooded killer, tipping the scales in favor of a death sentence.

On direct appeal, the Ohio Supreme Court found this claim lacked merit. It held:

Scott argues that his trial counsel's failure to object to testimony about his having had sexual intercourse with Amber Harsh after killing Green denied him effective assistance of counsel. He contends that the testimony not only prejudiced him during the guilt phase of trial but also incited the jury to recommend the death sentence.

To establish ineffective assistance of counsel, Scott must demonstrate that counsel's performance fell below the objective standard of reasonable competence, and that there is a reasonable probability that, but for such deficiency, the outcome of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

Here, the record reflects that after shooting Green, Scott went with Allen and Wilson to Harsh's apartment. Wilson testified that he thought Scott and Harsh had sex in her bedroom that night. Allen then corroborated Wilson's testimony. Scott's counsel did not object to the testimony. Although an objection might have been sustained, counsel's failure to object does not rise to the level of ineffective assistance of counsel under the *Strickland* test. Other evidence presented by the state, including Scott's confession to the police and to his friends, established his guilt of the charges. Given this evidence, Scott has not met his burden under *Strickland* to demonstrate that the outcome of the trial would have been different if his counsel had objected to the testimony about his sexual relations on the night he killed Green. Further, Scott's claim that this testimony incited the jury to recommend the death penalty is merely conjecture. Accordingly, Scott's claim of ineffective assistance of counsel is not well

49

taken, and we therefore overrule this proposition of law.

*State v. Scott*, 101 Ohio St.3d at 38-9.

The Ohio Supreme Court's reasoning is not clearly contrary to or an unreasonable application of any United States Supreme Court precedent. First, the Ohio Supreme Court correctly identified *Strickland* as the standard by which to review Scott's claim. It then determined that, given the overwhelming evidence of Scott's guilt, Scott could not establish that counsel's failure to object to the testimony prejudiced the outcome of the culpability phase of trial. Having failed to establish one of the two *Strickland* prongs, it found Scott was not entitled to relief. The court's finding complies with the *Strickland* holding that a petitioner must establish both prongs of the test before he or she can prevail. *Lundgren*, 440 F.3d at 770. The Ohio Supreme Court then reasoned that Scott's assertions of taint in the penalty phase of trial based on this information was pure speculation. The Sixth Circuit has held that when "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different," a petitioner cannot establish prejudice under *Strickland*. *Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006)(citing *Strickland*, 466 U.S. at 669). Because Scott proffers no factual support for his assertion that the jury sentenced him to death based in part on this evidence, the Court finds the Ohio Supreme Court's holding that Scott cannot establish prejudice regarding the effects this evidence had on the penalty phase of trial to be reasonable. This claim is not well-taken.

Finally, Scott's claim, 5(c), that counsel were ineffective for failing to move for a mistrial because members of Green's family were wearing t-shirts with his likeness on it has no merit. While Green's family members did arrive in the courtroom wearing these shirts, defense counsel called this fact to the trial judge's attention. Out of the presence of the jury, the trial court admonished the t-

shirt-wearing spectators that they must either remove the t-shirts, cover them, or leave the courtroom. Thus, there is no evidence that any juror viewed family members wearing the t-shirts. Without such a demonstration, Scott cannot establish that his counsel were unreasonable in failing to request a mistrial. *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006).

## 2. Seventh Ground for Relief - Ineffective Assistance During Penalty Phase

Scott asserts counsel were ineffective on several occasions during the penalty phase of his trial. He maintains that trial counsel were ineffective for failing to investigate and present evidence of the abuse he suffered by his adoptive family. 7(a). He also faults counsel for erroneously advising him about the consequences of making an unsworn statement. 7(b). Finally, he asserts that counsel were ineffective for failing to proffer evidence of his mother's background, a letter his brother wrote to him, and evidence about the jury's sentencing options. 7(c).

The Respondent concedes that Scott raised, and the Fifth District Court of Appeals addressed, the first sub-claim. He also acknowledges that, while Scott did not raise the second sub-claim on direct appeal, the Ohio Supreme Court *sua sponte* addressed this issue. In so doing, the Ohio Supreme Court forgave any procedural missteps Scott took in failing to raise the claim. This Court must do likewise and address this claim on the merits. *Ylst*, 501 U.S. at 801. Finally, Scott's third sub-claim was not raised until he filed an application to reopen his direct appeal. Thus, this sub-claim is procedurally defaulted, and the Court will not address it on the merits.[18]

### a. Sub-claim (a) -failure to investigate and present evidence

Scott lists a litany of evidence regarding the abuse he maintains he suffered at the hands of

---

[18]     Even if it were not defaulted, Scott could not prevail because he could not demonstrate that counsel's inactions prejudiced the outcome of the mitigation phase. *See* Eight Ground for relief, *supra*.

51

his adoptive family. He asserts that counsel neither investigated nor presented the following information for the jury's consideration:

a) The Scotts routinely beat their children, including Michael, with machine belts, which they called "Mr. and Mrs. Brown." These beatings left marks on their children; Exhibit 4

b) If chores were not completed properly Mr. Scott would wake up the foster children in the middle of the night, beat them with the belts, then make them complete the chore, which could extend into the early morning hours on school nights; Exhibit 4

c) The Scotts forced both foster and adoptive children, including Michael, to witness for their religion, Jehovah's Witness, in violation of social services regulations for foster homes; Exhibits 5, 10, 11

d) The Scotts forced Michael to witness to his former foster mother Mrs. Wilson and the foster children living in her home; Exhibit 5

e) While Michael liked being placed in a house with his biological brothers, he did not bond with, nor form an attachment to, the Scotts; Exhibit 5

f) Foster children placed with the Scotts had run away from the Scotts' home due to the abusive atmosphere; Exhibits 4, 6

g) The Scotts required their foster children to do certain tasks not required of their biological children; Exhibits 4, 6

h) When a foster child refused to go to the Jehovah's Witness Hall for a religious service, the Scotts placed two dogs on either side of the foster child to prevent her from getting up while the family was away; Exhibit 6

i) When a family friend of Michael's and former foster child of the Scotts heard Michael was to be placed with the Scotts, she tried to prevent him from being placed in their home so he would not have to suffer their abusive behavior; Exhibit 6

j) A former foster child of the Scotts believes they only took foster children for the money; Exhibit 6

k) Child services records show the Scotts lied about disciplinary methods.

*Petition*, Doc. No. 12-3, at 24. Scott asserts that, had the jury known of these abuses, it would have spared him the death penalty.

The Court reviews this claim pursuant to the standards set forth in *Strickland* as expounded upon in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In *Wiggins*, the Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.   The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and disclosing the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id.* at 527.   While *Strickland* established that strategic decisions generally are not subject to challenge, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  *Id.*  Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under *Strickland*.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Rompilla v. Beard*, 545 U.S. 374, 376 (2005)(internal quotation marks and citations omitted); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).

In the wake of *Wiggins*, both the United States Supreme Court and the Sixth Circuit have

53

issued several opinions further explaining counsel's obligations in the mitigation phase of a capital trial.  In *Rompilla*, the Supreme Court held that, despite the defendant's and family members' protestations that no mitigation evidence existed, counsel had a duty to investigate for such evidence, including reviewing prior court files that the prosecution intended to utilize.  Had counsel reviewed those files, the Court surmised, they "would have become skeptical of the impression given by the . . . family members and would unquestionably have gone further to build a mitigation case." *Rompilla*, 545 U.S. at 391.  The Court found that extensive mitigating evidence existed but was never presented to the defense team's mental health experts, who, consequently, found "nothing helpful to [Rompilla's] case." *Id.* at 392 (internal quotation marks and citation omitted).

The mental health experts obtained during state post-conviction proceedings, who had been supplied with school, medical, and prison records that trial counsel had never procured, found that the petitioner suffered from organic brain damage, an extreme mental disturbance, and impairment in several cognitive functions.  *Id.*  Confronted with this array of mitigating evidence that counsel failed to procure and introduce to the jury, the *Rompilla* Court held that counsel's failure to review the court files from the petitioner's prior convictions was unreasonable behavior and prejudicial to the outcome of the sentencing phase of trial.

The Sixth Circuit held in *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members.  *Id.* at 487 n.2.  The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain

damage, and/or mental illness . . . ." *Id.*

The Sixth Circuit provided further guidance to habeas courts in *Dickerson*, 453 F.3d at 696, opining that precedent such as *Wiggins*, *Rompilla*, and *Hamblin*, require that trial counsel's "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence." It concluded that, an incomplete mitigation investigation resulting from "'inattention, not reasoned strategic judgment' is unreasonable, as is abandoning 'investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible.'" *Id.* (quoting *Wiggins*, 539 U.S. at 527-28). Counsel not only have the duty to procure experts to aid them in investigation and subsequent formation of a mitigation strategy, but also have a concomitant duty to learn enough about the expert's conclusions to "make a reasoned determination about whether [to] abandon a possible defense based on [the] expert's opinion." *Richey v. Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007)(citing *Rompilla*, 545 U.S. at 387).

Any review of whether counsel's performance was deficient must begin with what counsel actually presented during the mitigation hearing. On direct appeal, the Ohio Supreme Court meticulously set forth the testimony presented at the hearing, as follows:

> During the penalty phase of trial, Scott called 13 witnesses and introduced documentary evidence for the jury's consideration.
>
> Kathleen Thompson, a social service worker for the Stark County Department of Human Services, testified that the department had arranged for Scott's placement in the Canton, Ohio, foster home of Katherine Wilson in 1981, because his mother had abused him. His mother had beaten him with a belt and punched him with her fists, causing hearing loss and damage to a kidney. Human Services placed Jason and Anthony, Scott's two brothers, into a separate foster home.
>
> Scott adjusted to living with Wilson but continued to live separately from his brothers. Approximately four years after being placed in foster care, Scott exhibited

55

behavioral problems, such as destroying other children's toys. He also had hearing problems, requiring tubes to be surgically inserted into his ears. Later that year, Scott's behavioral problems worsened, and he injured another boy with a screwdriver. When Scott was eight and a half years old, he "urinat[ed] on the wall * * *, pull[ed] his pants down, [and] act[ed] out" at school.

The following year, although Wilson loved Scott and had bonded with him, Human Services removed him from Wilson's home because of "his acting out behavior and because of Mrs. Wilson's declining health and inability to handle [Scott]." At that time, Human Services placed him with the Scott family, and they later adopted him.

Lisa Ann Hall, a foster child at the Wilson home when Scott lived there, testified that Wilson and Scott had had a very close relationship, "just like a regular mother and son." She explained that, because of the abuse that Scott had suffered, Wilson "just kind of took him under her wing more so than the other kids. He was shown a lot of attention."

Jerry Schweitzer, a chemical-dependency counselor, provided Scott's mother Julia counseling after she was admitted into the Interval Brotherhood Home, a long-term, inpatient drug and alcohol treatment center in Akron. Julia indicated that she began using drugs and alcohol at 18 years of age. According to Julia, her drug and alcohol abuse became problematic at the age of 21 because "she was staying out on the streets and not taking care of her baby."

Patrice Turner, Julia's neighbor in 1979, witnessed Julia's treatment of Scott and babysat for him when he was about three years old. Turner testified that Julia had called Scott a "little bastard" and had told him that "she didn't want him." Turner also had observed marks on Scott's body where Julia had "hit him with the belt" and stated that most of the time it looked as if he had been beaten with the buckle end. According to Turner, as a result of the physical abuse, Scott had "bruises on his legs, his hands and things like that." She also noted that Scott's face had sometimes been "bruised up" and that he had had cigarette burns on his back.

Turner testified that when Julia used drugs or alcohol, she would scream at her children and become violent. For example, Julia "would hit them, blame them for something that maybe a man had did to her or somebody else." Additionally, because Julia would run out of food near the end of the month, Turner often fed Scott and his brother.

Larry Perretta, a retired psychologist for Canton City Schools, testified that he evaluated Scott in 1985 because Scott had exhibited academic difficulties and behavioral problems. At that time, Scott, a second-grade student, had been held back in school for one year. Testing showed that Scott had an IQ of 86 on the Stanford-Binet Intelligence Scale, which placed him in the low-average range. Scott

further scored 85 for reading and spelling and 94 for arithmetic on other aptitude tests for which scoring is similar to that of the IQ test. Results of the Woodcock Johnson Psycho-educational Battery Test showed Scott to be "slightly below his ability level in the reading, spelling, written language areas and right in line with or slightly above his ability level in math."

Scott had not qualified for special education services because there had not been a sufficient discrepancy between his ability and achievement levels. Perretta, however, noted that Scott had appeared to suffer from attention deficit hyperactivity disorder ("ADHD") because he had difficulty sitting still and maintaining concentration in class and would often pester other students. Thus, Perretta had recommended that Scott continue to receive counseling and that he have a medical evaluation to determine whether he had ADHD.

In March 1987, a psychologist reevaluated Scott, then nine years old, due to his "ongoing behavioral problems." Teachers had reported that Scott "experienced problems in the lunch room, on the playground, [and] coming to and from school where he was occasionally physically aggressive toward other students."

At that time, the Wechsler Intelligence Scale for Children showed Scott to have an IQ of 92, similar to his earlier results. Scott's human-figure drawing test showed normal cognitive functioning and some indications of aggression. On the "hands test," a test that involves showing a child a series of pictures of hands in various positions and asking the child to describe what the hands are doing, Scott gave a high number of "acting-out type responses."

As a result of the evaluation, professionals recommended that he be placed in a more structured classroom environment because of his difficulty with self-control. Additionally, Perretta testified that it had again been recommended that Scott receive a medical evaluation, and he was placed on medication and assigned to a class for the learning disabled the following year. An addendum to the 1987 report indicated that Scott's behavior had improved when he took his medication, and he had eventually returned to a normal classroom.

Timothy Shaughnessy, a licensed independent social worker and a mitigation specialist, testified that the Stark County Department of Human Services had acted incompetently by failing to provide adequate supervision of Julia and failing to ensure Scott's and his brothers' safety at home. According to Shaughnessy, social-service workers failed to act on numerous complaints about Julia's abuse and neglect of Scott, despite having previously removed Scott's older brother, Kelly, from the home.

During the time that Scott lived with Julia, social workers found her home littered and dirty and noticed a lack of food in the house. They also received complaints that

Julia beat her children and frequently left them home alone. On one occasion, social workers visiting her home saw marijuana cigarettes.

In June 1981, when questioned by social workers about belt marks on Scott's body, Julia maintained that "[s]he was going to continue using the belt because it worked, [and] that was the only way to make him listen." During the next three months, social workers received additional reports that Julia physically abused Scott and his brothers and, in September, observed bruises and scabs on Scott's arm and back and a lump on his back near his kidney. Julia admitted that she had hit Scott with the belt because he had refused to go to bed. The following month, after Julia admitted hitting him again, Human Services placed Scott, then four years old, into foster care with Wilson.

In Shaughnessy's opinion, Wilson provided Scott with a loving home; however, Wilson's age, chronic illness, and responsibility for a large number of other children living with her limited the amount of attention Wilson could devote to Scott. According to Shaughnessy, Scott also lacked a male role model.

When Scott was ten years old, the Scott family took him into their home, reunited him with his brothers, and adopted him. The Scotts lived in a nice neighborhood and provided him with a stable and loving home environment. Scott also attended church with his family, who were Jehovah's Witnesses.

The Scotts were strict parents and set high standards for Scott. When Scott was a teenager, tensions developed between him and his parents over their rules. Scott began experimenting with drugs and alcohol. Further, church elders denied his request to be baptized because they felt that he did not behave properly. Soon after his 18th birthday, Scott left his parents' home.

Shaughnessy testified that in his opinion, Scott then became dependent upon alcohol, marijuana, and cocaine. Moreover, Scott had a genetic predisposition for chemical dependency because several close relatives, including his mother, grandparents, aunts, and uncles, suffered from drug and alcohol addictions. According to Shaughnessy, Scott used drugs and alcohol as "a way to cope with his pain, with his abusive childhood, his despair of * * * being yanked around from home to home, person to person."

Shaughnessy further testified that, according to Scott, by late 1997, he had been consuming a fifth of whiskey on a daily basis up until two days before his arrest on murder charges. Despite these facts, Scott claimed to have been sober on the day of the crimes against Stoffer.

Bruce Sampsel, a clinical psychologist, evaluated Scott in 1986 after he had been referred for treatment by the Canton City Schools. According to Sampsel, Scott

displayed a lack of control and disrespect for authority. He also developed a "neediness" relating to the absence of a father figure and his mother's abandoning him. After meeting with Scott on 37 occasions, Sampsel concluded that Scott had moderate to severe problems controlling his behavior and following rules.

Frederick Scott and his wife adopted Scott's two younger brothers and later adopted Scott, then 11 years of age. Scott adapted well to the family; however, Mr. Scott noticed a change in his behavior when he turned 17 years of age. Then, a couple of days after his 18th birthday, Scott dropped out of high school and moved out of his parents' home. At trial, Mr. Scott maintained that despite the current situation, he would not abandon his son, because "there was an attachment made there that goes beyond life."

Tanise Michelle Scott, Scott's sister, was 12 or 13 years old when Scott moved into the family home. She had had a good relationship with him, which she attributed to their closeness in age. She related that, at 18 years of age, Scott began having problems with their parents because "he wanted to do what he wanted to do" and made a poor choice of friends.

Bettie J. Scott explained that she and her husband had adopted Scott and his brothers because they loved them. The Scotts developed a good relationship with Scott until he was approximately 17 years old. At that point, Scott began making bad decisions, including his choice of friends. Despite her opposition, he left home to be with some of his friends. The Scotts did not know where he lived after leaving their home and had scant contact with him thereafter.

Jason Scott considers his brother Scott to be his best friend and continues to maintain as much contact with him as possible. Jason declared the day Scott left home to be the "[w]orst day of [his] life."

Dr. Robert Smith, a court-appointed psychologist, evaluated Scott and concluded that he was sane and competent to stand trial. He diagnosed Scott as suffering from "[a]ttention deficit disorder and hyperactivity disorder; dysthymia, which is a form of depression; and borderline personality disorder." Dr. Smith indicated that Scott had suffered from these disorders at the time he committed the offenses. Additionally, Dr. Smith diagnosed him as alcohol and cannabis dependent.

Julia Mae Williams testified that on July 23, 1977, she gave birth to Scott, who was premature and weighed only two pounds, two ounces. Julia related that Scott's natural father, Michael Dean Turner, had gone to the penitentiary when Scott was two years old.

Julia admitted abusing Scott, including striking him with a switch, and smoking marijuana about every other day. She attended programs to combat her drug and

alcohol problems and claimed to have never missed a meeting. These addictions, however, led her to neglect her children and eventually caused her to lose custody. She supported her drug and alcohol use by stealing, engaging in prostitution, and selling food stamps. She has a felony conviction for receiving stolen property.

Scott neither testified nor made an unsworn statement during the penalty phase of trial. In allocution, however, Scott acknowledged that he failed to "ever really think about the consequences" of his actions and that he "took responsibility for what [he] did, and to [him] that's the main key." He also apologized to the Stoffer and the Green families.

*State v. Scott*, 101 Ohio St.3d at 44-48.  As is apparent by the length of the above quotation, defense counsel presented a host of mitigating evidence during the penalty phase of trial.

As stated above, Scott presented this claim in his post-conviction petition.  On appeal from the denial of post-conviction relief, the Fifth District Court of Appeals reviewed this claim on the merits.  It found Scott could not establish that his counsel were ineffective:

In appellant's fourth claim for relief, appellant argued his trial counselors were deficient in failing to present evidence during the mitigation phase that his foster/adoptive parents, Fred and Betty Scott, were abusive. Appellant argued the lack of evidence regarding the environment in the Scott home undermined the adversarial process and rendered the outcome unreliable. He further argued his trial counselors were deficient in not investigating the issue further and presenting it to the jury.

In support of this argument, appellant listed specific incidents labeled a-k in his amended petition and offered *dehors* the record. This proffered evidence includes the affidavit of Patrice Turner, a neighbor of appellant and his biological mother and later a resident of the Scott home, and the affidavits of former foster children in the Scott home, Lisa Hall and Eric Calloway.

Appellant lived with his biological mother, Julia Williams, aka Murray until the age of five. Thereafter, Children's Services placed appellant with Katherine Wilson. Appellant stayed in the Wilson home until the age of ten when he was placed in the Scott home.

Ms. Turner testified during the mitigation phase. She testified to the abuse appellant suffered at the hands of his biological mother, as set forth in the affidavit. Vol II T. at 218-230. Also in her affidavit, Ms. Turner stated she had been placed in the Scott home, but the "home was so bad that I ran away." See, Turner Affidavit at ¶ 12. Ms.

60

Turner was not in the Scott home at the same time as appellant. Appellant was not placed in the Scott home until well after Ms. Turner had become an adult and had gotten married. *Id.* at ¶ 14-15.

Ms. Hall also testified during the mitigation phase. She testified to essentially the same things listed in her affidavit, the positive parenting appellant received in the Wilson home and the amount of time Mrs. Wilson gave to appellant. Vol. I T. at 183. This aspect of appellant's life was developed during the mitigation phase and was specifically addressed by the Supreme Court of Ohio in the Scott decision at ¶ 74 and 75:

"The following year, although Wilson loved Scott and had bonded with him, Human Services removed him from Wilson's home because of 'his acting out behavior and because of Mrs. Wilson's declining health and inability to handle [Scott].' At that time, Human Services placed him with the Scott family, and they later adopted him.

"Lisa Ann Hall, a foster child at the Wilson home when Scott lived there, testified that Wilson and Scott had had a very close relationship, 'just like a regular mother and son.' She explained that, because of the abuse that Scott had suffered, Wilson 'just kind of took him under her wing more so than the other kids. He was shown a lot of attention.'"

The affidavit of Mr. Calloway painted the conditions of the Scott home in a negative light. These statements were appositive to the Children's Services file and the testimony elicited during the mitigation phase. Vol. II T. at 368-371. There are no dates in the affidavit to verify that the two time frames wherein Mr. Calloway lived in the Scott home (five years in total) were parallel to appellant's time there.

During the mitigation phase, appellant presented the testimony of both Mr. and Mrs. Scott. They testified to their involvement and adoption of appellant. Both testified everything was well until about the time appellant turned seventeen. Vol. III. T. at 488, 490, 501-502. Appellant listened to the Scotts, but "he still wanted to do his own little thing." *Id.* at 488. Appellant left the Scott home at eighteen and subsequently dropped out of high school. Id. at 488-489. Appellant also presented the testimony of his two siblings who also lived in the Scott home. Both siblings testified to a normal family life and that they loved appellant. *Id.* at 494, 508, 510.

If Mr. Calloway lived in the Scott home at the same time as appellant, appellant's trial counselors would have been faced with presenting two diametrically opposed views. Clearly such a choice would have been deficient representation. If appellant had testimony contra to the portrait painted of the Scott home, he could have made an unsworn statement, but he declined to do so. Vol. III T. at 587-588.

*State v. Scott*, No. 2005CA00028, 2006 WL 173171 *4-5 (Ohio Ct. App. Jan. 23, 2006).

61

After reviewing the testimony counsel actually presented during trial and the Fifth District Court's findings regarding its sufficiency, this Court must now determine whether the Fifth District unreasonably applied *Strickland*, *Wiggins*, and their progeny as set forth above.  The Court first finds that, throughout most of its analysis, the Fifth District applied the correct *Strickland* test.  It found that the discrepancies between the mitigation testimony and the post-conviction affidavits regarding the Scott home environment and method of discipline were diametrical.  The Fifth District reasoned that "deficient representation" would have existed If counsel had presented evidence that the Scott home environment was both healthy and abusive. *Id.* at *5.  This finding comports with the first prong of the *Strickland* test.

It is the second finding that the Court finds to be more problematic.  Therein the Fifth District opines that, if Scott had information contrary to that presented during the mitigation hearing regarding his adoptive parents' care, "he could have made an unsworn statement." *Id.*  In this instance the Fifth District departs from the *Strickland* test.  Rather than focusing on the actions of the defendant, the *Strickland* test requires a reviewing court to examine counsel's actions alone to determine whether counsel performed deficiently.   Thus, the Fifth District incorrectly applied the *Strickland* test.

That the state court incorrectly applied the *Strickland* test does not end the matter.  United States Supreme Court precedent holds that a state court's incorrect application of its precedent does not warrant habeas relief.  As the Supreme Court has held, "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be

unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *Clark v. Mitchell*, 425 F.3d 270, 280 (6th Cir. 2005).

The Court finds that, while the Fifth District's application of the *Strickland* test as to its finding that Scott should have provided an unsworn statement was incorrect, it was not unreasonable. First, as noted above, the Fifth District's determination that defense counsel's presentation of diametrically opposed evidence would have been "deficient" was a correct application of the *Strickland* test. Moreover, the Fifth District's ultimate conclusion – that Scott could not establish counsel acted unreasonably– comports with both United States Supreme Court and Sixth Circuit precedent.

It is clear by the wealth of evidence that defense counsel presented at the mitigation hearing that defense counsel conducted a reasonably thorough investigation of Scott's background and presented evidence of it. Unlike defense counsel in *Wiggins*, who failed to present compelling evidence of the petitioner's poverty stricken and abusive upbringing, despite evidence that his mother was an alcoholic, defense counsel here presented extensive testimony about the abuse Scott suffered at the hands of his biological mother. Moreover, as the *Hamblin* Court advised, Scott's counsel followed the ABA Guidelines and investigated and produced testimony regarding Scott's adjustment at school, his I.Q., and psychological diagnoses.

Scott acknowledges that counsel provided an extensive mitigation presentation yet submits that counsel failed to investigate and present testimony regarding abuses that occurred in the Scott home. The Fifth District's findings on this issue are not clearly contrary to *Strickland* and *Wiggins*. It found that Scott did not establish a time frame during which Calloway and Hall lived at the Scott home. Thus, their allegations that the Scott parents were abusive does not establish that they

63

engaged in these practices while Scott lived in the home.  The Fifth District also observed that the Calloway and Hall affidavits contradicted some Children's Services records.  Its conclusion that counsel would have been deficient if it had presented the Scott home in both a positive and negative light was not an unreasonable one.

Finally, while the Fifth District did not adjudicate whether Scott established the requisite prejudice to prevail, the Court finds that Scott is unable to do so.  As the Sixth Circuit has held, "to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).  Here, while the evidence Scott presents differs in subject matter, it lacks strength, particularly in light of the myriad of evidence counsel presented during trial.  Many of Calloway and Hall's allegations, that they were forced to embrace the Jehovah's Witness religion, for example, are not especially mitigating.  The most serious allegation, Calloway's averment that Mr. Scott beat the children with machine belts, does not specify the frequency or duration of these beatings.  Finally, given the extensive abuse and neglect Scott suffered at the hands of his mother in his early childhood years, it is highly unlikely that the jury would have been moved by these cumulative, albeit different, allegations.  Accordingly, the Court finds that Scott cannot establish the prejudice that is required under *Strickland*.  Sub-claim (a) is not well-taken.

### b. Sub-claim (b) - inaccurate advice about unsworn statement

Scott contends here that his counsel were ineffective because they advised him inaccurately about the consequences of making an unsworn statement during the mitigation hearing.  The trial court placed Scott's waiver of presenting testimony on the record outside the presence of the jury.

In that hearing, counsel advised Scott that if he were to make an unsworn statement, the prosecution would be permitted to express "disdain" for Scott's failure to testify. *Return*, Apx. Vol. 13, at 588. The Respondent concedes that, pursuant to Ohio law, the prosecution is prohibited from such an expression and is limited to remarking that the defendant's statement was not under oath or subject to cross-examination. *State v. DePew*, 38 Ohio St3d 275, at ¶ 2 of the syllabus (1988).

On direct appeal, the Ohio Supreme Court also found that counsel's statement was incorrect, but summarily concluded that counsel's actions did not "rise to the level of ineffective assistance of counsel under the *Strickland* test." *State v. Scott*, 101 Ohio St.3d at 43. While the Ohio Supreme Court reached a decision on the merits, it did not supply a reasoned analysis of the claim. Although this cursory review is not identical to a state court's failure to adjudicate on a claim altogether, because of its failure to provide an explanation for its holding, the Court likens it to that circumstance. When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply. *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003). In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Maples*, 340 F.3d at 436-37.

In so doing, the Court finds that Scott cannot establish ineffective assistance for this claim. While the Court presumes, without finding, that counsel's conduct was unreasonable, it was not prejudicial. In his briefs, Scott asserts that, had he provided an unsworn statement, he could have accepted responsibility for the murders, enjoyed "common humanity" with the jurors, (Doc. Nos. 47, at 48), and provided an accurate portrait of the abuses that occurred in the Scott home.

65

None of the proposed testimony persuades the Court that the jury would have reached a different outcome had Scott presented it. First, Scott already had accepted responsibility for the murders by conceding his guilt during the culpability phase of trial.[19] Moreover, Scott's assertion regarding expressing "common humanity" with the jurors is vague and ambiguous. As stated above, counsel's decision to portray the Scott home as a loving environment would have rendered Scott's testimony to the contrary to be conflicting. Finally, as with sub-claim (a), the Court is hard pressed to find that any of these references regarding the substance about what Scott would have testified would have altered the jury's sentencing decision. The jury heard extensive testimony about the horrific abuse – his loss of hearing, cigarette burns, and kidney injury - all at the hands of his abusive mother. If this gross maltreatment did not persuade the jury that Scott's life should be spared, it is unlikely that Scott's expressions of "common humanity" would have changed their verdict. Scott cannot establish that he was prejudiced by counsel's misinformation regarding the unsworn statement. Accordingly, sub-claim (b) is not well-taken. *Lundgren* 440 F.3d at 770.

### 3. Tenth Ground for Relief - Ineffective Assistance of Appellate Counsel

In his final ineffective assistance claim, Scott contends that his appellate counsel were ineffective for failing to raise several issues on his direct appeal. Specifically, he contends that counsel should have raised the following issues: (a) trial court's failure to sever counts and the

---

[19]     Scott does not assert in his briefs that he could have expressed remorse, although he subsequently did so at his allocution. *See State v. Scott*, 101 Ohio St.3d 31, 49 ("Scott neither testified nor made an unsworn statement during the penalty phase of trial. In allocution, however, Scott acknowledged that he failed to "ever really think about the consequences" of his actions and that he "took responsibility for what [he] did, and to [him] that's the main key." He also apologized to the Stoffer and the Green families.").

66

failure to narrow the class of death-eligible defendants; (b) defense counsel's failure to request a mistrial based on victim's family's actions and failure to request the dismissal of prospective jurors for cause; (c) trial court's failure to dismiss alternates at the conclusion of the culpability phase of trial; and (d) defense counsel's failure to proffer additional evidence during mitigation. Scott also asserts that the cumulative effect of these failures prejudiced the outcome of his appeal.

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland*, discussed above, is applicable to claims of ineffective assistance of appellate counsel. Thus, Scott must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced him that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

The Court finds that none of Scott's sub-claims are well-taken. Because Scott raises all of these claims as distinct grounds for relief, and the Court addresses and rejects each of these claims elsewhere in this Memorandum of Opinion, the Court finds that Scott cannot establish the prejudice he must to succeed on an ineffective assistance of appellate counsel claim.[20] *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006)("We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier.").

Scott also cannot assert successfully that cumulative error should afford him relief. In

---

[20] Specifically, the Court addressed the factual underpinnings of the sub-claims as follows: sub-claim (a) in ground for relief three; sub-claim (b) in ground for relief five [Scott withdrew the part of this sub-claim pertaining to counsel's admission of his guilt]; sub-claim (c) in ground for relief six; and sub-claim (d) in ground for relief seven.

*Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), the Sixth Circuit acknowledged that "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Id.* at 816 (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.2005)). *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006)(holding that while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Lorraine*, 291 F.3d at 447. Accordingly, Scott's argument on this issue is not well-taken.

### F. Twelfth Ground for Relief - Proportionality Review

Scott contends that the Ohio Supreme Court did not conduct an adequate proportionality review of his case. Specifically, Scott claims that the Ohio courts improperly excluded cases in their review in which the State sought the death penalty but did not obtain it. Scott raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits. It is therefore preserved for federal habeas review. This claim is not be well-taken in any event.

A proportionality review is not constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007), *cert. denied*, 552 U.S. 1244 (2008). By statute, however, Ohio requires the appellate courts to engage in a proportionality review. Under Ohio Revised Code 2929.05(A):

> In determining whether the sentence of death is appropriate the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

68

Ohio Rev. Code 2929.05(A).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1990)(citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited. The habeas court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balcom*, 716 F.2d 1511, 1517 (11th Cir. 1983)). *See also Spinkellink v. Wainwright*, 578 F.2d 582, 604 (5th Cir. 1978),.

> In *Spinkellink*, the petitioner argued
>
> that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

*Moore*, 716 F.2d at 1517–18 (quoting *Spinkellink*, 578 F.2d at 604). The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." *Id.* (citing *Spinkellink*). It held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Id.* Moreover, when examining an Ohio capital conviction on habeas review, the Sixth Circuit has stated that, because "proportionality review is not required by the Constitution, states have great

latitude in defining the pool of cases used for comparison." *Buell*, 274 F.3d at 369.

The Ohio Supreme Court's review of Scott's sentence comports with constitutional requirements.  It held:

> We next address Scott's contention that Ohio's proportionality review is unconstitutional. Specifically, he urges that a meaningful proportionality review should include cases resulting in life imprisonment after a capital-sentencing hearing, as well as those resulting in the imposition of the death penalty. We have consistently held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of cases in which the death penalty has been imposed. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. Consequently, these propositions of law are overruled.

*State v. Scott*, 101 Ohio St.3d at 40-41.

This proportionality review does not "shock the conscience."  The Ohio Supreme Court reviewed cases involving course-of-conduct murders and kidnapping murders and found Petitioner's sentence proportionate based on the holdings in those cases.  *Id*. at 50. This Court can provide no further review.

### G. Thirteenth Ground for Relief - Cumulative Error

Scott asserts that the cumulative errors that occurred during his state court proceedings entitle him to habeas relief.  Although he acknowledges that the federal courts have not recognized cumulative error as a means of obtaining habeas relief, *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), he asserts that because the Ohio courts have recognized this type of relief it somehow establishes a liberty interest that federal due process requires be applied "where warranted." *Petition* (Doc. No. 12-3, at 44).  The Respondent asserts that this claim lacks merit because Scott failed to

70

raise it until his post-conviction proceedings.  Thus, the claim is procedurally defaulted.[21]

### H. Fourteenth Ground for Relief - Unconstitutionality of Lethal Injection

Scott's fourteenth ground for relief is that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Scott did not raise this claim until his post-conviction proceedings.  The post-conviction court barred the claim on the grounds of *res judicata*. This Court certified the following question to the Ohio Supreme Court: Is there a post conviction or other forum to litigate the issue of whether the Ohio lethal injection protocol is constitutional under *Baze v. Rees*, 533 U.S. 35 (2008), or under Ohio law? The Ohio Supreme Court determined that no such forum exists in Ohio. Scott v. Houk, Slip Opinion No. 2010-Ohio-5805.  Therefore, this claim is not procedurally defaulted.

This claim lacks merit.  The Supreme Court has long held the death penalty to be constitutional.  *Gregg v. Georgia*, 428 U.S. 153, 177 (1976).  In *Baze v. Rees*, 553 U.S. 35 (2008), that Court examined  Kentucky's three-drug lethal injection protocol (which was similar to Ohio's protocol at the time) and found that it did not violate the Eighth Amendment's prohibition against cruel and unusual punishment.  In so finding, the Court declared that "the Constitution does not demand the avoidance of all risk of pain in carrying out executions" since "[s]ome risk of pain is inherent in any method of execution– no matter how humane– if only from the prospect of error in following the required procedure." *Id*. at 47.  Indeed, the Court noted that it has never invalidated a State's method of execution as the infliction of cruel and unusual punishment. *Id* at 48.  It did,

---

[21]    Even if it were ripe for habeas review, this claim would not entitle Scott to habeas relief.  Scott fails to provide any authoritative support for this claim.  Thus, Scott cannot demonstrate that his federal due process rights are implicated.  Accordingly, this claim is not cognizable in a federal habeas proceeding.

however, point out its objections in the past to "the deliberate infliction of pain for the sake of pain," such as punishments that "involve torture or a lingering death." *Id*. at 49. Thus, the Court found that, in order to constitute cruel and unusual punishment, an execution method must present a "substantial" or "objectively intolerable" risk of serious harm. *Id*. at 61-62. After reviewing Kentucky's lethal injection protocol, the Court found that it did not meet that standard.

A year after *Baze* was decided, Ohio adopted a single-drug lethal injection protocol, with a back-up method for intramuscular injection should vascular access be problematic. This protocol was designed to provide a more humane alternative to the risk of pain arising from the use of the three-drug regimen previously used in Ohio and at issue in *Baze*. In *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009), the Sixth Circuit considered numerous objections to this new protocol, including "the undue risk of improper implementation of Ohio's protocol, leading to severe pain," "the employment of untrained and insufficiently competent medical personnel," and "the lack of supervision of the execution process by a licensed physician." *Id*. at 223. Relying on *Baze*, the court held that Ohio's new protocol (including both the use of a one-drug protocol and the back-up injection method) did not violate the Eighth Amendment. *Id*. at 223-24. It stated that "[p]ermitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of judicial authority." *Id*. at 225.

In addition, the court held that Ohio's statute providing the method of execution, Ohio Rev. Code. § 2949.22, did not create a liberty and property interest in a quick and painless execution protected by the Due Process Clause. *Id.* at 234. Finally, the court noted that, since *Baze*, every federal court of appeals that has addressed challenges to various states' lethal injection protocols has

72

rejected them. *Id.* at 221. This Court agrees with the analysis set forth in *Cooey* and accordingly, this ground for relief lacks merit.

For similar reasons, Scott's request to amend his petition is DENIED. First, the Court finds that the amendment does not relate back. Scott seeks to add an equal protection challenge to his petition. That challenge does not rely upon the same core facts as Scott's fourteenth claim for relief, despite his argument to the contrary. Scott's amendment relies upon findings made by another judge in a § 1983 action discussing whether Ohio routinely followed its written protocols. Scott's claim challenged the three-drug cocktail. It raised no challenge to the procedures or protocols. As such, permitting amendment now would open a vastly new area of core facts, well beyond the one year AEDPA statute of limitations. Accordingly, the motion to amend is DENIED.

## I. Fifteenth Ground for Relief - Unconstitutionality of the Death Penalty

Scott's fifteenth ground for relief is aimed at the structure of Ohio's capital punishment scheme. He asserts Ohio's capital punishment scheme is unconstitutional on its face. The Court addresses each sub-claims but is not persuaded by any of Scott's allegations. In summary fashion, and regardless of their defaulted status, the Court lists below these allegations, in italics, and thereafter states the reasons they are unpersuasive.

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.* The United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *Ohio's scheme is unconstitutional because the defendant must prove the existence of mitigating factors by a preponderance of evidence.* The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant. Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be

imposed without individualizing the sentence. *Id.* at 605. The Court further refined the statutory limiting requirement in *Zant v. Stephens*, 462 U.S. 862 (1983). In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Id.* at 877. Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).

      Ohio's death penalty scheme complies with these mandates. First, R.C. 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors. Moreover, R.C. 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute. Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in R.C. 2929.04(A) before imposing the death penalty.

- *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.* This argument is addressed in a previous claim. The Court will not re-address it.

- *Ohio's death penalty is applied in an arbitrary and capricious manner.* Other than bald assertion, Scott cites no specifics about the Ohio statutory scheme that substantiates his argument. More importantly, Scott does not state why the Ohio courts' application of the death penalty statutes runs afoul of United States Supreme Court jurisprudence.

- *Ohio's death penalty scheme is unconstitutional because it fails to permit independent aggravating factors.* Scott fails to explain this claim sufficiently. Thus, the Court cannot address it.

- *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.* No such constitutional mandate exits. Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial and encourages capital defendants to plead guilty.* In *United States v. Jackson*, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence. Conversely, in Ohio "a sentence of death is possible whether a defendant

74

pleads to the offense or is found guilty after a trial." *State v. Buell*, 22 Ohio St.3d 124, 138 (1986). Consequently, the Ohio scheme comports with constitutional mandates.

• *Ohio's scheme is not the least restrictive means of effectuating deterrence.* The United States Supreme Court addressed this exact point in *Gregg v. Georgia*, 428 U.S. 153 (1976). Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible." *Id.* at 175.

• *Ohio's scheme is unconstitutional because it is imposed in a racially discriminatory manner.* Scott alleges that those who are racial minorities or who kill whites are more likely to receive the death penalty. Pursuant to *McClesky v. Kemp*, 481 U.S. 279 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants or victims of a particular race. Instead, the capital defendant must prove that the decision maker in his or her individual case acted with a discriminatory purpose, and that such actions had a discriminatory effect on the proceeding. *Id.* at 292. As Scott has not asserted that discrimination occurred during his sentencing, this claim must fail.

• *Ohio's scheme does not provide for adequate appellate review.* Scott fails to elaborate on this assertion. Thus, the Court cannot address it.

### VIII. Certificate of Appealability Analysis

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Scott's claims. The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Scott presented in his Petition pursuant to 28 U.S.C. § 2253.

75

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court
. . .
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id.* at 483.   Thus, the Court determined

"[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's

76

decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

After taking the above standard into consideration, the Court finds as follows.

The Court will not issue a COA for claims 1, 2, 8(a), 13. The Fifth District Court of Appeals found that these claims could have been raised on direct appeal and barred them on grounds of *res judicata*. Accordingly, they are unequivocally procedurally defaulted.

Equally undisputed is the defaulted status of claims 3, 4, 5(a),(c), (d), 6, 7(c), and 8(c). Scott first raised these claims in his application to reopen the direct appeal as ineffective assistance of appellate counsel claims. Because he raises them as distinct grounds for relief here, the defaulted status of these claims is not debatable. *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002). Thus, the Court will not issue a COA for these claims.

No COA will issue for ground 5(b)(ineffective assistance during culpability phase for failing to object to prejudicial evidence). The Ohio Supreme Court's finding that Scott could not establish a *Strickland* violation based on counsel's failure to object to evidence that Scott had sexual relations on the night he killed Green is not unreasonable. As the Ohio Supreme Court observed, the trial judge may have sustained counsel's objection to this testimony. However, Scott cannot establish the prejudice prong of *Strickland* because there was overwhelming evidence of his guilt, including his own confession to the murder. Moreover, as the Ohio Supreme Court reasoned, Scott's

accusation that this information affected the jury's sentencing decision is speculative at best. No reasonable jurist would disagree with this Court's finding.

The Court grants a COA for grounds 7(a) and (b). As stated in the Memorandum of Opinion, it is a close question whether the Fifth District Court of Appeals correctly applied the *Strickland* test. Moreover, a jurist of reason could conclude that if counsel had demonstrated that Scott was abused in his adoptive home, in addition to the abuse he suffered at the hands of his biological mother, at least one juror would have been persuaded not to sentence Scott to death. Finally, a jurist of reason could conclude that Scott's unsworn testimony, which Scott asserts would have included accepting responsibility for the murders, would have affected the outcome of the mitigation hearing. Accordingly, a COA will issue for these claims.

No COA will issue for ground 8(b) (trial court's failure to allow evidence of the jury's sentencing options). The Supreme Court has held that the admissibility of evidence is governed by the state's rules of evidence. Whether the evidence Scott asserts is relevant is a decision for the trial court. No reasonable jurist would disagree with this Court's finding

No reasonable jurist would debate this Court's conclusion that Scott's ninth ground for relief (trial court's reasonable doubt instruction) is without merit. Capital habeas petitioners have raised this issue on numerous previous occasions and the Sixth Circuit has settled this question. No COA will issue for this claim.

Similarly, the Court will not issue a COA for ground ten (ineffective assistance of appellate counsel). Because the Court reviewed the factual underpinnings of all ineffective assistance of appellate counsel issues Scott raised and found that they lacked merit, Scott cannot establish, as he must under *Strickland*, that appellate counsel's failure to raise any of the issues Scott lists prejudiced

the outcome of the appeal.  Jurists of reason would find this decision unequivocal.

The Court will not grant a COA for the eleventh ground for relief (trial court's failure to merge statutory aggravating factors). The Court reasoned in the Memorandum of Opinion that Scott has not cited any Supreme Court precedent that suggests the trial court was required to merge the aggravating factors, and there was sufficient evidence that a kidnapping occurred.

No reasonable jurist would debate this Court's conclusion that Scott's twelfth ground for relief (proportionality review) is without merit. Because proportionality review is not required, states have great latitude in defining the cases used for comparison. The Ohio Supreme Court reviewed cases involving course-of-conduct murders and kidnapping murders and found Petitioner's sentence proportionate based on the holdings in those cases.

The Court grants a COA for ground 14 (constitutionality of Ohio's lethal injection protocol). The Sixth Circuit in *Cooey* has effectively rejected any claim regarding the one-drug cocktail. Accordingly, a COA will not issue for this claim.

Finally, the Court will not grant a COA for ground 15 (unconstitutionality of the death penalty).  This claim occurs almost *pro forma* in capital habeas petitions but is routinely denied. Reasonable jurists would agree with this finding.

### IX. <u>Conclusion</u>

For the foregoing reasons, the Petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to grounds 7(a) and (b), and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.R.App.P. 22(b) as to those grounds only.  As to all remaining grounds, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith

and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c);

Fed.R.App.P. 22(b).

       IT IS SO ORDERED.


  November 18, 2011                           */s/ John R. Adams*
Date                                 JUDGE JOHN R. ADAMS
                                     UNITED STATES DISTRICT JUDGE